1-99-1384 First Division

March 30, 2001

                                 

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 97 CR 29041

)

LEMARK GREEN, ) The Honorable

) Stanley Sacks,

Defendant-Appellant. ) Judge Presiding.

                      

JUSTICE COHEN delivered the opinion of the court:

Following a jury trial, Lemark Green was convicted of two counts of attempt (first-degree murder) and one count of aggravated discharge of a firearm.  The trial judge sentenced Green to concurrent prison terms of 30 years for each of the attempt counts and an extended concurrent term of 25 years for the single count of aggravated discharge of a firearm, with credit for time served.  Green now appeals his convictions, asserting that the State failed to prove the elements of the charged offenses beyond a reasonable doubt.  Green also claims that the trial court committed reversible error both in barring the admission of certain evidence ostensibly supporting the defense theory of a police "frame-up," as well as in imposing an extended-term sentence on the aggravated discharge of a firearm count. We modify Green's sentence as to the aggravated discharge of a firearm count and otherwise affirm the judgment of the trial court.

Evidence adduced at trial demonstrates that on October 1, 1997, after receiving an informant's tip that a produce stand on Ogden Avenue would be burglarized, Chicago police officers Daniel DeLopez and Mark Zawila of the Area Four mission team conducted stationary undercover surveillance of the produce stand.  The officers were wearing jeans and black hooded sweatshirts with their hoods pulled up and were sitting in a "covert" (nonpolice) vehicle, a blue Pontiac Sunbird.  Zawila sat in the driver's seat, DeLopez in the front passenger seat.  The Sunbird was parked in a lot located at 643 North Ogden Avenue.  The car was facing and perpendicular to the street, with the front end of the car approximately 8 to 10 feet from the curb.  The street was well-lit. 

Two other Chicago police officers assigned to the Area Four mission team, Baudilio Lopez and Jacob Galavan, were conducting mobile surveillance of the produce stand from a "covert" white Buick, with Lopez driving and Galavan in the front passenger seat.  Lopez and Galavan were also dressed in jeans and black hooded sweatshirts with the hoods pulled up.  Around 11 p.m., Lopez and Galavan drove northbound on Ogden Avenue and approached the parking lot where DeLopez and Zawila were parked.  Lopez pulled onto the sidewalk so that the white Buick was perpendicular to the blue Sunbird and parallel to Ogden Avenue, with the driver's door of the Buick approximately two to three feet from the curb.  The front ends of the two vehicles were approximately one to two feet apart.

Galavan rolled down the passenger side window and began speaking with DeLopez and Zawila.  About 30 seconds later, a brown Oldsmobile approached the parked cars in the northbound lane of Ogden Avenue nearest the curb.  Because they were facing right, toward the blue Sunbird, Lopez and Galavan did not see the Oldsmobile approaching from their left rear.  DeLopez and Zawila observed the brown Oldsmobile slow to 5 to 10 miles per hour and saw defendant Green lean out of the passenger window and extend his hand.  The officers saw that Green was holding a small-caliber semiautomatic pistol.  As Green's car passed the white Buick, Green fired four to five times in the direction of the officers.  Green's car never came to a complete stop. Green's car then fled northbound on Ogden Avenue with both of the police vehicles in pursuit.

DeLopez notified the 911 communications center that shots had been fired at police officers.  The officers pursued Green's car as it turned left onto Milwaukee Avenue and left again onto Chicago Avenue, moving approximately 50 to 55 miles per hour.  Green's car then attempted to turn left onto Ada, but was prevented from doing so by a marked squad car moving along Ada in the opposite direction.  Green's car veered back onto Chicago Avenue and then turned left onto Noble Street, where it was stopped by another marked squad car.  The two "covert" cars pulled in behind Green's, with several other marked squad cars arriving within moments.

  Green and the driver of the brown Oldsmobile, Eric Fields, both exited the vehicle as it stopped.  Green fled toward the sidewalk.  Zawila and DeLopez pursued Green on foot.  DeLopez reached Green first, tackling Green and pushing him into a parked car.  Zawila then joined in DeLopez' attempt to subdue Green, who was struggling violently.  Lopez and Galavan also assisted in the struggle; together, the officers were finally able to handcuff Green.  Green continued to resist and rolled on the ground, kicking his legs and shouting obscenities.  As Green was taken to a waiting police wagon, DeLopez noticed that Green was bleeding from his head.  Galavan and Lopez conducted an initial search of the Oldsmobile but were unable to locate the pistol used in the shooting.

Officers Castaneda and Burmisterz, also assigned to the Area Four mission team, responded to the "shots fired" call.  Castaneda was assigned to search for weapons in the area around the shooting scene but found no weapons.  Castaneda then went to the Noble Street location where the Oldsmobile had been stopped and was told to search the vehicle.  During his search, Castaneda noticed that a plastic panel between the driver's side doors was pulled out from the sidewall of the Oldsmobile approximately one-half inch.  Castaneda pulled on the exposed edge of the plastic and a small semiautomatic pistol fell onto the back floor of the car.  The pistol was left in place for forensic recovery.

Around 11:40 p.m., forensic investigator Officer Joseph Dunigan and his partner were called in to analyze the scene of the shooting.  Dunigan observed expended pistol cartridge cases in the street along the curb at 643 North Ogden Avenue.  Dunigan also found a cartridge case and a portion of a spent bullet along a wrought-iron fence at the rear of the lot where the "covert" police cars were parked.  Dunigan and his partner photographed the entire area and all of the firearm evidence 
in situ
.  Dunigan then recovered the spent casings and the bullet fragment, which he determined to be .25 caliber.  Dunigan placed the spent casings and the bullet fragment in a Chicago police department envelope, which he then sealed and initialed.   

Dunigan also examined certain vehicles present at the shooting scene.  He inspected a camper, a van, a construction crane and DeLopez and Zawila's blue Pontiac Sunbird, which a detective had returned to the shooting scene after Green was in custody.  Dunigan determined that both the crane and the Sunbird had sustained probable bullet damage.  The crane had a dent in the metal door facing Ogden Avenue and the Sunbird had a cylindrical gouge on the front of the passenger-side windshield, which had also been facing Ogden Avenue.

Dunigan next went to the scene of Green's arrest to process the brown Oldsmobile.  Dunigan photographed the vehicle, searched it and recovered the .25 caliber semi-automatic pistol from the floor of the rear seat area.  He removed the magazine from the pistol, determined that it was empty, and prepared it for analysis.

Tonia Brubaker, a forensic scientist for the Illinois State Police, analyzed the pistol and the firearm evidence recovered from the shooting scene.  Brubaker determined conclusively that the bullet fragment and the expended cartridge casings recovered from the shooting scene were fired from the .25 caliber semi-automatic pistol recovered from the brown Oldsmobile in which Green had been riding.

Green testified at trial and offered an entirely different account of the events of that evening.  Green stated that around 10:40 p.m., Fields arrived at Green's apartment at 725 North Ada, where Green was living with Vanessa DeRussy.  Fields and Green left in Fields' brown Oldsmobile with the eventual goal of visiting a friend at Norwegian Hospital; however, they first went to look for Juan Renteria in the neighborhood of Green's apartment.  They were unable to locate Renteria, so Green asked Fields to take him to meet DeRussy at a local gas station near the intersection of Grand and Armour.  Green testified that while he and Fields were parked at a stop sign at the intersection, a white Buick Skylark rear-ended the Oldsmobile.  Both the driver and the passenger of the Buick were wearing sweatshirts with the hoods pulled over their heads.  Fields asked the occupants of the Buick for insurance information.  The occupants did not respond; instead, they "stared down" Fields and Green.  The passenger of the Buick then threw garbage at Fields' car through the window of the Buick, after which the Buick drove off.  Green testified that the car had neither license plates nor a city sticker.  Fields then engaged in a high-speed pursuit, chasing the Buick several blocks and through at least one red light.  The Buick finally turned northbound onto Ogden Avenue and, after a few more blocks, pulled abruptly onto the sidewalk on the right side of the street, ending up perpendicular to a blue Pontiac Sunfire that was parked in a lot at that location.  Green stated that as he and Fields pulled up next to the white Buick, the driver of the Buick extended his arm out of the window and was holding a gun in his hand.  Green and Fields both ducked down, and Fields drove off with the Buick and the Pontiac in close pursuit.  Fields turned left onto Milwaukee Avenue and left again onto Chicago Avenue.  Green testified that he asked Fields to take him home, but as they attempted a left turn onto Ada, a marked squad car was coming up Ada from the opposite direction.  Fields then pulled back onto Chicago Avenue with the squad car falling into place behind Fields' car.  The squad car then turned on its roof lights, at which point Fields took the next possible left turn onto Noble Street and stopped.  Another squad car on Noble then blocked in the front end of Fields' car.

Green testified that uniformed officers then exited the squad car in front of Fields' Oldsmobile with guns drawn and pointed at himself and Fields.  Green raised his hands, at which point plainclothes officers, also with guns drawn, opened the driver's side door of the Oldsmobile and commanded Fields to exit the vehicle.  When Fields stepped out, one of the officers forced Fields to his knees, removed the magazine from his pistol and struck Fields in the mouth with the pistol.  Another officer attempted to open the passenger door, which was locked, and commanded Green to unlock the door.  When Green exited the car, a plainclothes officer cuffed Green's left wrist, pulled it behind his back and reached to immobilize Green's right hand.  As he did so, Officer Solis ran up and punched Green in the face.  Green then stated that he was pushed to the ground, where Officer Delatorre kicked him between the legs.  Galavan then began to choke Green, and other officers repeatedly struck Green as he lay on the ground.  Another officer then lifted Green to his feet by his handcuffs and walked him across the street to a waiting paddy wagon.  Green began to scream out his name, at which point an unidentified officer struck him and told him to remain quiet.  When officers put Green in the paddy wagon, DeLopez entered the wagon behind him and struck Green about the head with a flashlight 15 to 17 times.  

Green then testified that officers took him to the Harrison and Kedzie police station, where he was processed and taken to a hospital for treatment consisting of a total of 40 stitches to his chin and the back of his head.  He was then returned to the police station.  At trial, Green denied any involvement in the shooting incident.

1.  Sufficiency of Evidence.

Green first contends that the State failed to prove him guilty beyond a reasonable doubt of two counts of attempt (first-degree murder) and one count of aggravated discharge of a firearm.  This court recently addressed the proper standard of review of a challenge to the sufficiency of evidence supporting a criminal conviction:

" 'A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that a reasonable doubt of the guilt of the defendant remains.  [Citation.]  Upon a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant.  [Citation.]  Rather, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact.  [Citation.]  In the consideration of a defendant's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]' "
  
People v. Coleman
, 311 Ill. App. 3d 467, 473 (2000), quoting 
People v. McLaurin
, 184 Ill. 2d 58, 79 (1998).

See also 
People v. Thompson
, 313 Ill. App. 3d 510, 515 (2000).  In order to support a conviction for attempt (murder), the State must establish beyond a reasonable doubt that: (1) the defendant performed an act constituting a "substantial step" toward the commission of murder, and (2) the defendant possessed the criminal intent to kill the victim.  
People v. Carroll
, 260 Ill. App. 3d 319, 329 (1992).  

On appeal, Green does not dispute either the State's characterization of his act of firing a pistol four to five times in the direction of the officers sitting in the "covert" police cars as a "substantial step" toward the commission of murder or the sufficiency of the evidence supporting the jury's finding in this respect.  Neither does Green challenge the sufficiency of the evidence supporting his conviction for aggravated discharge of a firearm.  Rather, Green argues that the totality of the evidence fails to show beyond a reasonable doubt that Green acted with the specific intent to kill.  Specifically, Green argues that had he intended to hit the officers, he could not possibly have missed at close range from a slow-moving vehicle, and the fact that no officer was struck is therefore sufficient to raise a reasonable doubt as to his intent to kill when he fired the shots.

"Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred.  [Citations.]  Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life."  
People v. Winters
, 151 Ill. App. 3d 402, 405 (1986).  "It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears there exists a reasonable doubt as to the defendant's guilt."  
Winters
, 151 Ill. App. 3d at 406.  

The officers' testimony shows that Green committed a classic "drive-by" shooting: the brown Oldsmobile containing Green and Fields slowed as it passed the cars containing the officers; the officers saw Green fire four to five shots from a pistol in their direction, and Green and Fields then fled in the Oldsmobile down Ogden Avenue.  Green argues that he could not possibly have missed the officers from such a close range had he intended to kill them.  We agree that one could reasonably argue that the fact that Green failed to strike the officers could support an inference that he lacked the intent to kill.  However, that fact also supports the alternative inference that Green was simply unskilled and missed his targets.  The decision as to which of competing inferences to draw from the evidence is the responsibility of the trier of fact.  
Coleman
, 311 Ill. App. 3d at 473.  Poor marksmanship is not a defense to attempt (murder).  Based on the evidence adduced at trial, a rational jury could readily have found beyond a reasonable doubt that Green intended to kill the officers when he shot at them.  Accord 
People v. Sowewimo
, 276 Ill. App. 3d 330, 340 (1995).  We therefore find that Green's challenge to his conviction on this basis is without merit.

Green's reliance on the decision of this court in 
People v. Homes
, 274 Ill. App. 3d 612 (1995), is misplaced.  In 
Homes
, we held that verdicts finding the defendant guilty of the attempted murder of Moore, a bystander, but innocent of the attempted murder of Shelly, the intended victim, were legally inconsistent, requiring that the conviction as to Moore be vacated.  
Homes
, 274 Ill. App. 3d at 622-24.  We held that where the defendant is found to have lacked the specific intent to kill a particular individual, there remains no intent to be "transferred" to a bystander.  
Homes
, 274 Ill. App. 3d at 623.  Green argues that because DeLopez and Zawila offered the only testimony as to Green's  intent, and the jury acquitted Green as to attempt (murder) with respect to those officers, then there remained no intent to be "transferred" in support of Green's convictions as to Officers Lopez and Galavan.  Green misconstrues 
Homes
.  Unlike 
Homes
, in which there was extensive testimony from Shelly regarding a past altercation with the defendant – lending credence to the theory that Shelly had been the intended victim and that Moore truly was an innocent bystander – there was no evidence in the case at bar that any of the four officers was other than an intended victim of the shooting.  
Homes
, 274 Ill. App. 3d at 615-17.  The State's case against Green was not based on the theory of transferred intent.  
Homes
 is of no help to Green.

Green also cites 
People v. Hartfield
, 266 Ill. App. 3d 607 (1994), arguing that because Lopez and Galavan did not see Green fire, and the jury failed to convict Green as to the attempt (murder) charges relating to DeLopez and Zawila, both of whom testified that they witnessed the shooting, the jury must have disbelieved DeLopez and Zawila's testimony.  Therefore, Green argues, DeLopez and Zawila's testimony was insufficient to support Green's convictions as to Lopez and Galavan.  We disagree.  
Hartfield
 stands for the proposition that the State must prove beyond a reasonable doubt that the defendant fired 
in the direction of a person
 in order to sustain a conviction for aggravated discharge of a firearm.  
Hartfield
, 266 Ill. App. 3d at 608-09.  The conviction in 
Hartfield
 was overturned because the State failed to offer any evidence that the defendant fired in the direction of the complaining detective.  
Hartfield
, 266 Ill. App. 3d at 609.  In the case before us, however, the State offered the testimony of Officers DeLopez and Zawila that they saw Green fire  in the direction of all four of the officers.  The fact that the jury failed to convict Green as to  DeLopez and Zawila does not mean that the jury rejected their testimony outright, nor does it mean that their testimony was thereby rendered valueless in all respects.  It merely means that in the view of the jury, for whatever reason, the State failed to carry its burden of proof as to the attempt (murder) charges relating to these officers.  Cf.  
People v. Ethridge
, 131 Ill. App. 2d 351, 353 (1971) (holding that an acquittal as to one codefendant required that the conviction of a second codefendant on the same evidence be vacated).  Credibility determinations are the responsibility of the trier of fact.  This court is limited to considering whether a rational trier of fact 
could
 have found the required elements of each offense beyond a reasonable doubt.  
Coleman
, 311 Ill. App. 3d at 473.  After a careful review of the record, we find that based on the evidence before it, a rational jury could have found the required elements of attempt (murder) as to Officers Lopez and Galavan, and that Green's conviction on those charges must be affirmed.  

2.  Exclusion of Evidence.

Green also argues that the trial court committed reversible error in excluding certain evidence that would have supported the defense theory of a police "frame-up." Green sought to elicit evidence that: (1) sometime prior to the night of the shooting, Green had filed a brutality complaint against Officers Delatorre and Solis; (2) as a result of the complaint, Delatorre faced suspension from the police force; and (3) Delatorre and Solis, with the full cooperation and participation of Officers DeLopez, Zawila, Lopez and Galavan, had therefore contrived the entire shooting incident as a means of revenge against Green for the filing of the complaint.  In a pretrial hearing, the trial court excluded any such evidence on the grounds of relevancy.  During trial, the court further barred Green from testifying as to any of the excluded matter.  The court also barred the defense both from questioning DeLopez, Zawila and Lopez
(footnote: 1) on cross-examination regarding the excluded matter and from calling Delatorre and Solis as adverse witnesses.  The State did not call either Delatorre or Solis as a witness in its case in chief.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401;
 
Spencer v. Wandolowski
, 264 Ill. App. 3d 611, 617 (1994); 
People v. Printy
, 232 Ill. App. 3d 735, 745 (1992); 
People v. Monroe
, 66 Ill. 2d 317, 322 (1977) (adopting the Rule 401 definition of relevance as Illinois law).  "This definition of relevancy encompasses the materiality of evidence as well as its probative value."  
Spencer
, 264 Ill. App. 3d at 617.  

"Materiality, or 'fact of consequence' as it is referred to in the Federal rules, refers to the relationship a particular proposition bears to the ultimate determination of the action. [Citation.] Probative value, on the other hand, refers to the tendency of the evidence to render a particular proposition more or less probable than it would be without the evidence, and is determined by testing the proffered fact against 'the light of logic, experience, and accepted assumptions of human behavior.' [Citation.]"  
Spencer
, 264 Ill. App. 3d at 617.  

Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial effect.  
People v. Amaya
, 255 Ill. App. 3d 967, 971-72 (1994).  "A trial court's determination of whether evidence is relevant and admissible will not be reversed absent a clear abuse of discretion resulting in prejudice to the defendant."  
People v. Jones
, 306 Ill. App. 3d 793, 799 (1999). 

A careful review of the record reveals that the trial court acted well within the bounds of its discretion in excluding the disputed evidence.  The "facts of consequence" to the outcome of Green's trial were limited to those encompassed by the charged offenses, 
i.e.
, whether Green committed attempt (murder) and aggravated discharge of a firearm.  Officers Delatorre and Solis were not present at the scene of the shooting, did not participate in the car chase, and did not participate in recovering or handling any of the evidence used against Green at trial.  Delatorre and Solis were neither witnesses to the occurrence of the charged offenses nor victims thereof.  Their sole involvement with Green was to ride in one of the several marked police cars that arrived at the scene of Green's arrest, which was certainly plausible based on the fact that they were assigned to the district in which the arrest took place.  We hold that Green's prior involvement with these officers was collateral to the outcome of his trial and that Green suffered no prejudice based on the exclusion of this evidence.

Green further argues that the trial court's decision to bar him from inquiring into this alleged conspiracy on cross-examination of DeLopez, Zawila and Lopez denied Green his constitutional right to confront witnesses and present a defense.  U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8.  
"Any limitation of cross-examination is within the sound discretion of the trial court, and a reviewing court will not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant."  
People v. Fierer
, 260 Ill. App. 3d 136, 148 (1994); 
People v. Gonzalez
, 238 Ill. App. 3d 303, 326 (1992).  

"Cross-examination to show interest, bias or motive on the part of a witness is a matter of right, subject only to the broad discretion of the trial court to preclude repetitive or unduly harassing interrogation and, 
assuming a proper subject matter
, to control the extent of cross-examination. [Citation.]  It is a right protected by both the Federal and Illinois constitutions.  * * *  The interest is satisfied when counsel is permitted to expose the jury [to] facts from which the jurors, as the sole triers of fact and credibility, could 
appropriately
 draw inferences relating to the reliability of the witness. [Citation.]   It is important to note that the constitutional requirement must be satisfied first and only then does the court have discretion to limit the scope or extent of cross-examination. [Citations.] The proposed cross-examination 
must relate to a proper subject matter * * * .
  

* * *  

The widest latitude possible should be allowed a defendant on cross-examination for the purpose of establishing bias, motive or interest on the part of a witness. [Citation.] Where the defendant's theory is that the prosecution's witness is unbelievable, it is error not to allow the cross-examination on matters which would 
reasonably
 tend to show  bias, interest or motive to testify falsely. [Citation.] However, evidence of bias, interest or motive
 must not be remote or uncertain, 
because the evidence
 
must potentially give rise to the inference that 
the witness has something to gain or lose by his testimony.
"
  
(Emphasis added.)
  People v. Furby
, 228 Ill. App. 3d 1, 3-5 (1992).  

"It is well established * * * that a trial judge has wide latitude to impose reasonable limits on cross-examination based on concerns about harassment, prejudice, 
confusion of the issues
, or interrogation that is repetitive 
or of little relevance
." (Emphasis added.)
  Fierer
, 260 Ill. App. 3d at 148.  Thus, the potential limitations on a defendant's right to cross-examine a witness as to bias, interest or motive to testify falsely are clearly rooted in the relevancy concepts of materiality and probative value.  The proposed line of questioning must relate to a "proper," or material, subject matter, and the evidence that the defendant seeks to elicit must not be "remote or uncertain," 
i.e.
, the evidence must be probative of whether "the witness has something to gain or lose by his testimony."  
Furby
, 228 Ill. App. 3d at 5.   

"The test is whether limitation on cross-examination created a substantial danger of prejudice by denying defendant his right to test the truth of the testimony.  [Citation.]  To determine the constitutional sufficiency of a cross-examination, a court looks not to what a defendant has been prohibited from doing, but to what he has been 
allowed
 to do.  [Citation.]  If the entire record shows that the jury has been made aware of adequate factors concerning 
relevant
 areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry."  (Emphasis added.)  
Averhart
, 311 Ill. App. 3d at 497.

Green misconstrues 
Averhart
.  In 
Averhart
, the  trial court limited the defendant's cross-examination of Officer Smith, who was the arresting officer and the State's key witness, regarding Smith's potential bias based on a past brutality complaint that the defendant had filed against Smith.  The theory of the defense was that Smith had framed the defendant in retribution for the filing of the complaint.  
Averhart
, 311 Ill. App. 3d at 498.  On appeal, we held that it was critical for the jury to have a full understanding of the relationship between Smith and the defendant in order to properly weigh their respective credibility.  We further held that the trial court's decision to restrict the defense in presenting the facts of the complaint to the jury indicated that the jury had not been made aware of adequate factors concerning what we found to be a relevant area of impeachment of the witness, thus violating the  confrontation clause.   
Averhart
, 311 Ill. App. 3d at 499.  

Green, on the other hand, was allowed ample opportunity to confront, cross-examine and test the truth of the testimony of the State's witnesses against him: DeLopez, Zawila and Lopez.  The totality of the record indicates that the jury was made aware of sufficient relevant areas of impeachment of these officers (such as the question of the presence of license plates on the undercover vehicles, the unusual stakeout procedure of having one "covert" vehicle pull up on the sidewalk next to another, the failure to use radios, etc.) that the trial court's restrictions on Green's cross-examination of these officers failed to raise any constitutional issue.  
Averhart
, 311 Ill. App. 3d at 497.  

Also, under the rule in 
Furby
, we fail to see how  testimony relating to the past relationship between Green and Officers Delatorre and Solis would "give rise to the inference" that Officers Lopez, Zawila and DeLopez themselves 
had "something to gain or lose" by testifying as they did.  
Furby
, 228 Ill. App. 3d at 5. 
 
The mere fact that they are all police officers is insufficient.
 
 Without more, there is simply too great a leap of logic between evidence that Green filed a complaint against one of their fellow officers and the conclusion that the presentation of such evidence to the jury would 
reasonably
 allow the jury to infer that Officers Lopez, Zawila, DeLopez and Galavan joined with that officer and his partner in planning and executing what amounts to a major criminal conspiracy in retribution against Green for filing the complaint, followed by perjuring themselves 
en masse
 at trial.
  People v. Mitchell
, 238 Ill. App. 3d 1055, 1066 (1992).  See 
People v. Jones
, 288 Ill. App. 3d 293, 299 (1997) ("The question is whether [the] evidence * * * would 'reasonably tend to show' any bias, interest, or motive of the police officer to testify falsely").  The fact that the witnesses were police officers does not 
per se 
render the matter of Green's prior complaint against another officer a "relevant area of impeachment."  
Averhart
, 311 Ill. App. 3d at 497.

The confrontation clause guarantees criminal defendants the opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense desires.  
Delaware v. Fensterer
, 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294 (1985).  We find that the evidence that defense counsel sought to elicit was sufficiently remote and speculative that the trial court's limitations on Green's cross-examination of the officers, including the court's refusal to allow the defense to call Delatorre and Solis as adverse witnesses, failed to create a substantial danger of prejudice to Green.  The ruling of the trial court in this respect was not an abuse of discretion and must be affirmed.  
People v. Rivera
, 307 Ill. App. 3d 821, 833 (1999);
 People v. Jones
, 288 Ill. App. 3d 293, 299 (1997); 
People v. Smith
, 172 Ill. App. 3d 94, 109 (1988); 
People v. Brouder
, 168 Ill. App. 3d 938, 946 (1988).

 3.  One act, one crime.

Green further argues that his conviction for aggravated discharge of a firearm should be vacated as based on the same physical act as the attempt (murder) convictions.  We disagree.  We have found in other cases that multiple shots fired in rapid succession at a single victim will support only a single conviction.  See 
People v. Guzman
, 208 Ill. App. 3d 525, 534-36 (1990); 
People v. Baity
, 125 Ill. App. 3d 50, 51-54 (1984)
;  People v. Connor,
 82 Ill. App. 3d 652, 660 (1980). 
 
Green, however, fired at 
four different victims
.  As there is no evidence indicating that all four to five shots were aimed at the same victim, thus arguably rendering the series of shots a single "act," we find that each of the gunshots was a separate "act" capable of sustaining a separate conviction.  
People v. Miller
, 284 Ill. App. 3d 16, 26-27 (1996).
  
Green's conviction for aggravated discharge of a firearm is affirmed. 

4.  Extended-term sentence.

Green argues, and the State concedes, that the trial court improperly imposed upon Green an extended-term sentence of 25 years on the aggravated discharge of a firearm count, predicated on Green's past felony convictions.
(footnote: 2)  A defendant's sentence will not be altered on review absent an abuse of discretion.  
People v. Streit
, 142 Ill. 2d 13, 19 (1991).  However, "the plain language of [the sentencing statute] requires that, when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction 
within the most serious class
 and only if that offense was accomplished by brutal or heinous behavior."  (Emphasis added.)  
People v.
 
Jordan
, 103 Ill. 2d 192, 206 (1984); 730 ILCS 5/5-8-2 (West 1996).  Attempt (murder) is a Class X felony.  720 ILCS 5/8-4(c)(1) (West 1996).  Aggravated discharge of a firearm is a Class 1 felony.  720 ILCS 5/24-1.2(b) (West 1996).
  
Clearly, aggravated discharge of a firearm was not within the most serious class of offenses of which Green was convicted.  Therefore, the trial court abused its discretion in imposing an extended-term sentence for this offense.  In the interest of judicial economy, we hereby reduce Green's sentence on the count of aggravated discharge of a firearm to 15 years, the maximum sentence otherwise allowed by law.  730 ILCS 5/5-8-1(a)(4) (West 1996); 134 Ill. 2d R. 615(b)(4).  In all other respects, the judgment of the trial court is affirmed.

Affirmed as modified.      

McNULTY, P.J., and TULLY, J., concur.

         

FOOTNOTES
1:

  Officer Galavan was in California working for the Drug Enforcement Administration at the time of trial and did not testify.

2:

  We note that because the extended-term sentence at issue in this case was predicated on Green's prior felony convictions, it was not constitutionally flawed under the recent decision of the Supreme Court of the United States in 
Apprendi v. New Jersey
, 530 U.S. ___, __ , 147 L. Ed. 2d 435, 456, 120 S. Ct. 2348, 2362-63 (2000).