THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EPIFANIO SALGADO, Defendant-Appellant.

Third District    No. 3—03—0447

Opinion filed October 22, 2004.

SCHMIDT, J., dissenting.

Richard M. Goldwasser, Ralph E. Meczyk (argued), and Gal Pissetzky, all of Chicago, for appellant.

Jeff Tomczak, State's Attorney, of Joliet (Lawrence M. Bauer and Gary F. Gnidovec (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SLATER delivered the opinion of the court:

Defendant Epifanio Salgado was convicted of unlawful possession

of cannabis with intent to deliver (720 ILCS 550/5(g) (West 2002)) and he was sentenced to a 10-year term of imprisonment. On appeal, defendant contends that he was denied a fair trial when: (1) the State was allowed to introduce evidence that defendant had posted $75,000 as bail; and (2) the State improperly commented on the exercise of his right against self-incrimination. We reverse and remand.

## Facts

The 55-year-old defendant testified that he was born in Mexico and came to the United States in 1966. He is a legal resident and lives in Chicago. Defendant primarily worked as a waiter or bartender at various hotels and private clubs, but he also worked as a day laborer on construction jobs. Two or three times per week, around 7 a.m., defendant would go to a gas station at Belmont and Milwaukee Avenues near his home where he and others would gather and wait to be hired by contractors or homeowners.

On the morning of March 27, 2002, the defendant went to the gas station looking for work. A man in a truck told defendant that he had a construction job in Joliet and gave him a telephone number. The man told defendant to call later to see about the job. Defendant waited around looking for other work, but was unsuccessful and went home between 9 a.m. and 9:30 a.m.

Between 11 and 11:30 a.m., defendant called the telephone number he had been given to make sure he had the job. He was told to call back around 1 p.m.; when he did, he was given the address of a Clark truck stop in Joliet. Defendant drove his wife's minivan to the truck stop and arrived at about 1:45 p.m. When he arrived, defendant did not see anyone and he called the number again. He was told to drive to the back of the gas station, where he saw a man waving at him near a tractor-trailer. Defendant parked his van, exited, and retrieved his tool belt. He walked up to the truck and told the man that he was there for the job; the man was now inside the cab of the truck. The man began pushing a big box toward the door, and he asked defendant to help him put the box on the ground. Defendant helped the man unload the box and 10 to 12 law enforcement agents jumped out and placed the defendant under arrest.

Inside the box and two others was cannabis. Defendant testified that he did not know what was in the box and that he had gone to the truck stop for a construction job. The man at the gas station had never mentioned anything about picking up or handling any boxes. Once at the police station, the defendant told the police how he had come to be at the truck stop. Defendant specifically denied telling the police that he was supposed to drive the van to a gas station at Cicero and Chicago Avenues and leave it there.

The truck from which the defendant unloaded the box had left El Paso, Texas, with a shipment of car parts. Cesar Ortega and Oscar Munoz drove the truck and stopped on the way to Chicago to pick up the boxes of cannabis. Ortega testified that when he left El Paso, he had a telephone number of the person to whom he was to deliver the boxes. Ortega was given a code phrase, *"vamos caminos de Durango,"* to use when he called the number. Ortega stated that he called the number five times after entering Illinois. During the first call, Ortega uttered the code phrase and kept driving. According to Ortega, he did not recognize the voice of the person who answered the first call. No one answered the second call, Ortega testified. After the second call, Ortega stated that they delivered the car parts to Indiana. During the drive to Indiana, Ortega said he made a third call and told the person that he was not ready because he was late for his delivery in Indiana. He recognized the voice as the same person who answered the first call. Ortega then testified that he made a fourth call before he arrived in Joliet. During this fourth call, Ortega told the person that he needed to set up a time for the delivery and to bring another person because the boxes were heavy. Ortega then made a fifth call while at the truck stop in Joliet to tell the person where his truck was. Ortega recognized the person's voice as the same during the first, third, fourth and fifth calls. At trial Ortega identified the voice as belonging to defendant.

While Ortega was waiting, law enforcement agents approached. The agents searched the truck, found the marijuana and arrested Ortega and Munoz. Ortega agreed to cooperate with the agents, who then climbed into the truck with him and waited for someone to pick up the boxes.

Officer Eugene Talley is a detective with the Palos Park police and was assigned to a Drug Enforcement Agency (DEA) task force group. On March 27, 2002, Talley and another agent, Ron Baffield, went to the Clark truck stop in Joliet as part of their drug interdiction duties. Talley's suspicion was aroused when he saw a truck with two people inside pull into the truck stop and park in a remote area. Talley and Baffield spoke to the people in the truck—Ortega and Munoz—and obtained their consent to search the truck with a canine unit. Talley found three boxes labeled "Panasonic TV/VCR" which contained cellophane-wrapped bricks of marijuana. He then learned that someone would arrive in about 40 minutes to pick up the drugs. Another officer, Master Sergeant Juan DeLeon, then joined them. DeLeon waited with Ortega in the truck for the person to pick up the marijuana.

DeLeon testified that he saw the defendant drive into the truck stop and that he waved him over to the truck. The defendant parked

next to the truck, got out of his car and put a thick belt on around his waist. DeLeon asked the defendant if he was there for the marijuana. DeLeon testified that defendant either did not hear him or ignored him. According to DeLeon, the defendant said that they should hurry up. Defendant then helped him unload one of the boxes, and DeLeon gave the arrest signal. Each box weighed over 200 pounds.

DeLeon testified that when he interviewed defendant at the police station, the defendant told him that he had gone to a gas station at the intersection of Cicero and Chicago Avenues that morning where he and other day laborers congregate to look for jobs. Defendant told DeLeon that he had been given a phone number to call for a job. When he called, the defendant was told to drive to the Clark truck stop to pick up some boxes. When DeLeon asked the defendant if he knew what was in the boxes, he said that he had not asked and he did not want to know. DeLeon also testified that the defendant told him that he was supposed to take the boxes to the gas station at Chicago and Cicero Avenues and leave his van there with the keys inside. When he returned a few hours later, payment for the job would be in the van.

Officer Gregory Jordan of the Joliet police department testified that he was present when Officer DeLeon was questioning the defendant. Jordan heard the defendant say that he was to leave the van at the gas station at Chicago and Cicero Avenues.

Guadalupe Rodriguez, a former DEA agent and a retired 27-year veteran of the Chicago police department, testified for the defense. Rodriguez testified that drug cartels often involve innocent people in the distribution of narcotics. The reason cartels use innocent people is that they are less likely to steal the drugs and if caught they cannot provide police with any information that would incriminate those in the chain of distribution. According to Rodriguez, the greater the quantity of drugs transported, the more likely drug traffickers will use an unwitting person, whom law enforcement people call "mules."

## Testimony Concerning Defendant's Bail

During a sidebar from the State's cross-examination of the defendant, the prosecutor informed the court that he intended to inquire about the fact that defendant posted $75,000 cash bail on the day after his arrest. The State argued that defendant's ability to raise such an amount undermined the credibility of his testimony that he was a waiter and a day laborer. The trial court agreed that, since defendant had presented evidence of his employment history and his income, the State could attack his credibility in those areas. Thereafter, the State elicited from the defendant that $75,000 in cash had been

posted to secure defendant's release from jail on the day after his arrest. The trial court then gave a limiting instruction informing the jury that such testimony was offered for the sole purpose of weighing defendant's credibility and was not to be considered as bearing directly on defendant's guilt. On redirect examination, the defendant testified that he had nothing to do with raising the $75,000 and was unaware that it had been posted until he was released from jail. He later learned that $19,000 had come from his savings and the remainder was a loan from his wife's family.

## Analysis

The defendant first contends that the trial court erred in allowing the State to introduce evidence concerning the defendant's bail, which resulted in a denial of due process. We agree.

## Standard of Review

The scope of cross-examination generally rests within the trial court's discretion and will not be interfered with on review absent a clear abuse of discretion resulting in manifest prejudice to the defendant. See *People v. Hall*, 195 Ill. 2d 1, 743 N.E.2d 126 (2000); *People v. Terrell*, 185 Ill. 2d 467, 708 N.E.2d 309 (1998). The same abuse of discretion standard is applied to a trial court's rulings concerning the relevance and admissibility of evidence. See *People v. Green*, 339 Ill. App. 3d 443, 791 N.E.2d 134 (2003).

■ Defendant asserts that evidence regarding his posting of bail was not relevant to any material issue before the jury. We agree. "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Patterson*, 192 Ill. 2d 93, 115, 735 N.E.2d 616, 629 (2000). Probability in this context is considered in the light of logic, experience and accepted assumptions concerning human behavior. *Patterson*, 192 Ill. 2d at 115, 735 N.E.2d at 629-30.

■ The central issue in this case concerned defendant's knowledge of the cannabis. The State's theory was that defendant was the person who was to receive the delivery from Ortega and Munoz. Defendant, on the other hand, essentially claimed that he was an innocent dupe. We fail to see how the fact that defendant, or someone on his behalf, was able to quickly raise $75,000 for bail makes either the State's or the defendant's position more or less probable. Although one could speculate that a drug dealer might have ready access to substantial sums of cash, without some evidentiary link between the $75,000 and illegal activity, it remains pure speculation. There are numerous ways that such a sum could be obtained, including, as the defendant

explained, from one's relatives and from savings. "Evidence is admissible if it is relevant to an issue in dispute *and if its prejudicial effect does not substantially outweigh its probative value.*" (Emphasis added.) *Patterson*, 192 Ill. 2d at 114-15, 735 N.E.2d at 629. The evidence that defendant posted $75,000 in bail was not only irrelevant but was prejudicial because it invited the jury to speculate about the source of the funds. See *People v. Alamo*, 406 N.Y.S.2d 787, 63 A.D.2d 6 (1978) (improper to question defendant concerning source of $5,000 bail, as it suggested that defendant had committed unrelated crimes); see also *People v. Jones*, 404 N.Y.S.2d 865, 62 A.D.2d 356 (1978) (evidence that defendant had $831 at time of arrest for drug offense was improperly admitted; defendant could have acquired money in variety of ways). In view of its lack of probative value and potentially prejudicial effect, the bail evidence should have been excluded.

The State argues that the bail evidence was admissible as an attempt to undermine defendant's credibility. The State correctly notes that, in general, any permissible kind of impeaching matter may be presented on cross-examination, as one purpose of such questioning is to test the credibility of the witnesses. *Hall*, 195 Ill. 2d 1, 743 N.E.2d 126. Accordingly, the scope of cross-examination is liberally construed "to allow inquiry into whatever subject tends to explain, discredit, or destroy the witness' direct testimony." *Terrell*, 185 Ill. 2d at 498, 708 N.E.2d at 325. The State contends that the bail evidence refuted defendant's direct testimony which presented a "wholesome image" of defendant as a "poor handyman." We disagree. Although defendant testified about various jobs he had held such as a waiter, bartender, and construction laborer, very little information was offered concerning his income or his financial situation. Defendant testified that three of his four daughters lived with him and his wife in an apartment that they rented for $700 per month. Defendant's wife could not work because she had been injured in an accident. Before moving to Chicago in 1994, defendant owned a home in California that was partially destroyed by an earthquake. The home was not insured. The only evidence concerning defendant's income was elicited by the State on cross-examination, when defendant testified that he made $12.50 per hour plus tips as a waiter and $100 to $150 per day as a construction laborer. While defendant's ability to raise $75,000 might seem unexpected in light of his choice of professions, it does not impeach his testimony regarding his work history. What it *does* do, however, is suggest that the $75,000 may be the proceeds of illegal activity, despite the lack of any evidence in that regard.

There is yet another reason, apart from the lack of relevance and the prejudicial effect of the bail evidence, for denying its admissibility.

The Illinois Constitution creates a rebuttable presumption that a defendant is eligible for bail. *People v. Purcell*, 201 Ill. 2d 542, 778 N.E.2d 695 (2002); see Ill. Const. 1970, art. I, § 9. The principle underlying the granting of bail is that a person accused of a crime is presumed to be innocent until he is proved guilty at trial. *People ex rel. Gendron v. Ingram*, 34 Ill. 2d 623, 217 N.E.2d 803 (1966). Allowing the State to use the fact that defendant has posted bail against him at his trial penalizes him for exercising his constitutional right to bail and denigrates the presumption of innocence on which it is based. As the Supreme Court stated in ruling that evidence presented at a suppression hearing could not be used against the defendant at trial, "we find it intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259, 88 S. Ct. 967, 976 (1968). Similarly, we find it intolerable that the State would invite the jury to draw unfavorable and highly speculative inferences from a defendant's exercise of his right to be released on bail.

The State also maintains that any error that may have occurred in admitting the bail evidence was harmless beyond a reasonable doubt. Again we disagree. "An error may be deemed harmless beyond a reasonable doubt if other evidence against the defendant is so overwhelming that there is no doubt of the defendant's guilt." *People v. Williams*, 332 Ill. App. 3d 693, 699, 773 N.E.2d 1238, 1243 (2002). While there was certainly sufficient evidence to support the jury's verdict, we do not believe that it can be fairly characterized as overwhelming. Defendant's actions were consistent with his explanation that he had gone to the truck stop expecting to be hired for a construction job. Guadalupe Rodriguez's testimony supported defendant's implicit claim that he was merely an unsuspecting "mule." While various inculpatory statements were attributed to the defendant by other witnesses, the defendant steadfastly denied making such statements. Accordingly, defendant's credibility was critical to his defense. That credibility was damaged, however, not by the use of proper impeachment evidence, but by inviting the jury to speculate about the source of the $75,000 used to secure defendant's release. In so doing, the State has made it impossible for us to determine whether the jury convicted the defendant because they believed him guilty of the crime charged or because he was "guilty" of being able to quickly raise $75,000. We therefore reverse and remand for a new trial.

■ We briefly address the defendant's second issue, in which he asserts that the State improperly commented on his postarrest silence when it elicited testimony that defendant did not agree to drive the van to Chicago and did not ask police why he was being arrested. In

*Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the Court held that a defendant cannot be impeached with his post-*Miranda* silence. *Doyle* does not appear to apply to this case, however, because here the defendant waived his *Miranda* rights and voluntarily spoke to the police. See *Anderson v. Charles*, 447 U.S. 404, 65 L. Ed. 2d 222, 100 S. Ct. 2180 (1980). In any event, defendant's failure to object waived this issue. See *People v. Graham*, 206 Ill. 2d 465, 795 N.E.2d 231 (2003) (applying waiver rule to alleged *Doyle* violation).

For the reasons stated above, the judgment of the circuit court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

O'BRIEN, J., concurs.

JUSTICE SCHMIDT, dissenting:

I disagree with the majority's conclusion that the admission of evidence regarding defendant's posting of $75,000 cash bond was improper error and therefore respectfully dissent.

Reviewing defense counsel's opening statements makes it clear that from the start of this trial the defendant attempted to paint a picture of himself as a poor immigrant laborer who had to move from California to Illinois because he could not produce $10,000 to repair his residence following an earthquake. During direct examination, defendant continued to try to paint this picture by introducing significant testimony regarding his financial status. This testimony included the fact that defendant's wife has been disabled and unemployed for more than three years as a result of an accident. Moreover, defendant chose to inform the jury that he could no longer afford to own a house and therefore has to rent one at a cost of $700 per month. Defendant continued to make relevant his financial status by further noting that at times his daughter had to help pay the utility bills. The State did not attempt to introduce any evidence regarding defendant's financial condition prior to the aforementioned testimony.

Again, during opening statements, defense counsel stated to the jury that the defendant would prove he was an "unwitting dupe." In an attempt to prove this, defendant chose to put into evidence his entire work history. The jury was told that at the time defendant was arrested, "work was a little slow" and that defendant "was only working part-time."

In an attempt to attack defendant's credibility, the State was allowed to introduce evidence that the defendant came up with $75,000

in cash within approximately 24 hours of his arrest. I disagree with the majority's finding that this information was irrelevant. The defendant's choice to "poor mouth" to the jury makes his ability to acquire $75,000 cash within a 24-hour period relevant. While I agree with the rules of law set out by the majority regarding our standard of review and the test to determine the relevancy and admissibility of evidence, I simply disagree with their analysis that this evidence was irrelevant.

Furthermore, given the facts of this case and how this evidence was admitted, I disagree with the majority that allowing the State to admit this evidence penalizes the defendant for exercising his constitutional right to bail. The majority cite *Simmons v. United States* to support that conclusion. Reliance upon *Simmons* is misplaced. The majority find support in the "intolerable" sentence in *Simmons*, ignoring the sentence that immediately follows it which sets forth the rule that when a defendant exercises a constitutional right, such action "may not thereafter be admitted against him at trial *on the issue of guilt.*" (Emphasis added.) *Simmons v. United States*, 390 U.S. 377, 394, 19 L. Ed. 2d 1247, 1259, 88 S. Ct. 967, 976 (1968).

For more than 30 years, Illinois' courts have understood the distinction between allowing the State to use a constitutionally afforded right on the issue of guilt versus using the same information for impeachment purposes. Specifically, in *People v. Wolfram*, the court held "while the prosecution in *Simmons* used the testimony against the defendant on the issue of guilt, as part of its case in chief, in the instant case plaintiff did not use defendant's testimony to show guilt but rather for impeachment purposes." *People v. Wolfram*, 12 Ill. App. 3d 262, 267, 298 N.E.2d 188, 192 (1973). The same is true here. The State did not mention the $75,000 during its case in chief. Rather, the State cross-examined the defendant during the defendant's case in chief as to how a poor day laborer could produce $75,000 in cash within a 24-hour period. The trial court gave a specific limiting instruction that the testimony regarding bail "was offered for the sole purpose of weighing the credibility of [the defendant's] testimony. This testimony is not to be considered by you relative directly to the question of whether the defendant is guilty or not guilty of the charges against him."

Unlike the majority, I do not believe this impermissibly forces a defendant to surrender one constitutionally afforded right for another. Moreover, I do not believe allowing such evidence in circumstances such as this has any chilling effect on parties posting bail.