FIRST DIVISION 

January 18, 2000

No. 1-98-0742

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee, 

v.

STANLEY COLEMAN,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Themis N. Karnezis

Judge Presiding.

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Following a bench trial defendant, Stanley Coleman, was convicted of the  first degree murder of his 11-month-old son, T.S.  The trial court also found that under the applicable statutory guidelines it could only sentence defendant to either a term of natural life imprisonment without parole or death.  The court found defendant ineligible for the death penalty and sentenced him to a term of natural life imprisonment.  On appeal, defendant argues that the State's evidence was insufficient to prove him guilty of first degree murder and defendant challenges the constitutionality of the statute that mandated his natural life sentence.   730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 1998).  We affirm in part, vacate in part, and remand.   

I. TRIAL TESTIMONY

On April 6, 1997, Falona Love, T.S.' mother, called defendant and requested that defendant pick up and take care of T.S. for a few days.  Despite an asthmatic condition, Love testified that T.S. was in relatively good health.  Love additionally testified that she never saw defendant abuse their son, but she believed that T.S. sometimes was afraid to be with defendant.  She also noticed that after a prior visit with defendant, T.S. had a bruise on his left eye and a scratch on his chest.  Love denied that T.S. had recently been injured from a fall down the stairs.  After picking T.S. up, defendant took him to his apartment that he shared with his girlfriend, Tonya Gooch.  When they arrived at the apartment, Gooch changed T.S.' diaper and did not notice any injuries.  On April 7, 1997, Gooch cared for T.S. during the morning and evening hours and testified that T.S. was in good health. 

On April 8, 1997, Gooch woke T.S. up and dressed him so that he could accompany defendant to his mother's house, where defendant cared for his paraplegic brother.  Gooch then went to work.  Later in the day, defendant called Gooch at work.  Defendant told her that he took T.S. to his mother's house and, at the house, T.S. fell off the bed and struck an adjacent table.  Defendant also stated that, as a result of the fall, T.S. had a couple of bruises and his lip was puffy.  Gooch told defendant to put some ice and Vaseline on T.S.' face.  Defendant next went to Gooch's work with T.S.  Gooch observed a couple of bruises on T.S.' face but did not notice any swelling on his lip.  During the evening, Gooch babysat for T.S. while defendant attended parenting classes and did not see any new injuries on T.S.  Before returning from his parenting class, defendant  picked up two of his other sons, Derius and Darione, to spend the night at his apartment.  Derius was four years old and Darione was two years old.

On the morning of April 9, 1997, Gooch again woke and began to dress T.S. when defendant told her that he was unable to go to work that day at his mother's house because he did not have a babysitter for his children.  Gooch left defendant with his three sons and went to work.  Defendant called 
Gooch again at work and told her that he had called an ambulance because T.S. had an asthma attack, his eyes were going back in his head, and defendant did not know what to do.  Gooch did not see T.S. alive again.  Gooch additionally testified that she never saw defendant abuse his children.  She described defendant's older son, Derius, as "bossy" and stated he was rough with other children. 

At approximately 12 p.m., on April 9, firefighters Ernis Pernae and Keith Oliver responded to an emergency call at defendant's apartment.  When they arrived, defendant came down the stairs of the apartment building with T.S. and handed him to Oliver.  T.S. was lifeless and not breathing.  Oliver initiated CPR in the hallway of the building.  Defendant told Oliver that T.S. had fallen down the stairs the day before.  Defendant also appeared calm.  When the paramedics arrived, they took the baby to the hospital.  Defendant did not go with the paramedics to the hospital and Oliver was unsure of exactly where defendant went when the paramedics came.

At 12:30 p.m., Chicago police officer Nancy Mallory arrived at defendant's apartment.  She saw the paramedics working on T.S. in the ambulance.  Officer Mallory went to defendant's apartment, where she saw and spoke with defendant.  Defendant told her that T.S. was on the couch drinking water and he started to vomit.  Defendant stated that he picked up T.S., saw that his head went back, believed that he was not breathing, and called for help.  Defendant also told Officer Mallory that the previous day T.S. had fallen out of bed and struck his head on a table.  Defendant arranged for his sister to watch his children and went with Officer Mallory to the hospital.  After a short wait at the hospital, a doctor informed defendant that T.S. had died.    

Dr. James Filkins, a deputy medical examiner, testified that on April 10, 1997, he performed an autopsy on T.S.  At the time of his death, T.S. weighed 19 pounds and measured 27½  inches in length.  Dr. Filkins observed 22 separate external injuries.  He noted bruises on T.S.' forehead, eyes, and elbow; a scratch on the right eye and a small abrasion below the eye; two small hemorrhages inside the right eye lid in the sclera; abrasions and scratches on the right nostril, right and left cheeks, and left jaw; abrasion and hemorrhaging on the lower lip; and a laceration to the tongue.  The  internal examination of T.S. by Dr. Filkins revealed substantial injuries.  He observed hemorrhages on the left and right sides of T.S.' skull, over the center of his forehead, and in the left temporal muscle.  Dr. Filkins further found a larger, more pronounced subgaleal hemorrhage near the front of T.S.' forehead, 15 cubic centimeters of subdural blood in the bottom of the skull cap, and a brain edema or brain swelling. 

Dr. Filkins testified that to a reasonable degree of medical certainty T.S. died from blunt head trauma that caused a subdural hematoma.  Dr. Filkins explained that the blunt trauma consisted of impact injuries to T.S.' head, which, in turn, caused swelling to the brain, subgaleal hemorrhages, and a subdural hematoma.  All these conditions contributed to T.S.' death.  Dr. Filkins additionally testified to a reasonable degree of medical certainty that asthma was not a cause of T.S.' death.  According to Dr. Filkins, a "significant amount of force" caused several of the subgaleal hemorrhages because they  bled into the muscles under the skull.  Dr. Filkins did not believe that a fall down the stairs and a fall off a bed could have solely caused the injuries to T.S.  Dr. Filkins based this opinion on the substantial number of internal injuries he observed, including bruising to the sides of the head and the brain edema.

Dr. Filkins next described a brain edema and testified that this condition develops very quickly, within a matter of hours and not within days or weeks.  Dr. Filkins stated that a brain edema could be caused by shaking a child, impact injuries, or a combination of shaking and impact injuries.  Dr. Filkins stated that a child's fall from a bed and the striking of a table would not involve severe enough impact to cause a brain edema.  Dr. Filkins also did not believe that T.S.’ alleged fall down the stairs a week before his death could have caused the brain edema because it was too remote in time.  If any of these events caused the brain edema, Dr. Filkins testified, T.S. would have died at the time of the event and not a day or week later.  Dr. Filkins also testified that T.S. suffered from shaken baby syndrome and described this syndrome as vigorous shaking of a child that causes internal injuries such as retinal hemorrhages, subdural hematomas, and brain edema.  Dr. Filkins concluded that T.S. was subjected to abuse on the day of his death.

Dr. Elise Torczynski, an expert in ophthalmic pathology, testified that she examined the eyes of T.S. and found preretinal, intraretinal, and subretinal hemorrhages, subdural hemorrages of the optic nerve, and perineural hemorrhages.  She found these conditions in both eyes.  Dr. Torczynski opined that a fall or a small injury did not cause the hemorrhaging; rather, the massive amount of hemorrhaging in both eyes indicated that T.S. was violently shaken or hit against something multiple times or experienced a combination of both forms of abuse.  Dr. Torczynski additionally testified that T.S. suffered from shaken baby syndrome.

Assistant State's Attorney (ASA) Sang Shim testified that he interviewed defendant on April 10, 1997, at the police station with two detectives.  Defendant told him that Love called him on April 6, 1997, and asked him to pick up T.S.  On April 8, 1997, he took T.S. to his mother's house and placed him on a bed.  While defendant was caring for his brother, he heard a noise from the bedroom where he placed T.S.  Defendant went into the bedroom and found T.S. lying face down on the carpeted floor.  T.S. was not crying, but was whimpering.  Defendant picked him up and placed him back in bed.  Defendant stated that, at first, he did not notice any injuries on T.S. but, later in the day, he noticed bruises on his face and lips.  Defendant called Gooch and told her what happened.  Defendant also stated that, after returning from his parenting class that evening, defendant noticed that T.S. was running a fever.  

On April 9, 1997, defendant stated he watched T.S. at his apartment.  Defendant attempted to give T.S. some milk, but he was unable to drink it, so he gave him some water.  While defendant was preparing to take a shower, he heard a choking sound and saw that T.S. was vomiting.  Defendant stated that he then walked over to T.S. and, with both hands, he began to shake T.S.  Defendant stated that he noticed T.S.' head flip back and his eyes roll back in his head.  Defendant also saw that T.S. was having difficulty breathing.  Defendant next called an ambulance and performed mouth-to-mouth resuscitation on T.S.  ASA Shim testified that, during this interview, defendant also stated that he had killed T.S., that T.S. died while he was with him, and that he was unsure how he killed T.S.  Defendant asked for a gun so that he could kill himself because he had killed T.S.

ASA Shim interviewed defendant again that evening. Defendant told him initially that he suspected that his son, Derius, hit T.S. with a massager but then recalled that he had taken the massager away from T.S.  On April 11, 1997, ASA Shim interviewed defendant for a third time and asked defendant how T.S. sustained his head injuries.  Defendant responded that he wanted ASA Shim to shoot him because that would end it all and prevent him from returning to jail.  Defendant also stated that he did not know how T.S. was injured other than the fall from the bed that he previously mentioned.

Defendant testified in his own defense.  Defendant stated that on April 6, 1997, he received a call from Love to pick up T.S.  He brought T.S. to his apartment.  On April 8, 1997, defendant went to work at his mother's house to care for his brother and brought T.S. with him.  Before starting his work, defendant placed T.S. in a bed in the guest bedroom.  While tending to his brother in a different room, defendant heard a noise from the guest bedroom and went there.  Defendant saw T.S. lying on the floor.  T.S. did not appear injured and defendant put him back in the bed.  Defendant later saw a bruise on T.S.' lip.  That night defendant went to his parenting class and picked up two of his other sons to stay with him.

On April 9, 1997, defendant testified that T.S. woke up with a fever and a bloodshot eye.  Defendant did not go to work because he did not have a babysitter for his children.  In the morning, Defendant fed T.S. baby formula and put him on the living room couch with Darius.  While preparing a bath in the bathroom, defendant testified that Derius screamed that T.S. was sick and defendant returned to the living room.  Defendant saw that T.S. was throwing up and he picked him up and put him on his lap.  Defendant began to tap T.S. on the back.  Defendant next testified that T.S. continued to throw up and "everything started going crazy."  Defendant started to shake T.S. and he described the shaking as similar to "playing" or  "dancing" with a child.  At this point, T.S.' eyes were in the back of his head, he was foaming at the mouth, and his mouth was bluish and white.  Defendant also saw that T.S. was not breathing.  He therefore gave him mouth-to-mouth resuscitation and called 911.

Defendant denied ever abusing T.S.  He did not know how T.S. received the bruises on his face that Dr. Filkins described.  Defendant additionally denied telling the police that T.S. fell down the stairs the day before.  He did admit, however, that he attempted to tell the paramedics every possible detail that he thought could have contributed to T.S.' injuries.  Defendant claimed that ASA Shim was adding to the statements that he made.  Defendant testified that, in response to ASA Shim's questioning and accusations, defendant told Shim that if he thought he did something to T.S., Shim should get a gun and shoot him.  Defendant indicated that he repeatedly told Shim that he did not know what happened to T.S.  He did acknowledge to Shim that T.S. was in his care when he died.  Defendant further testified that at the time of T.S.' death he was 5 feet 6 inches tall and weighed 150 pounds.  Defendant testified that he never intended to hurt T.S.

Following closing arguments, the trial court found defendant guilty of the first degree murder of T.S.  After the State sought to impose the death penalty, the court found that defendant was ineligible for the death penalty because the death in this case did not result from exceptionally brutal or heinous behavior.  The court sentenced defendant to a mandatory term of natural life imprisonment  without parole.  Defendant now appeals.

II. ANALYSIS

Defendant first argues that the State did not prove him guilty of first degree murder beyond a reasonable doubt.  Defendant claims that T.S.' injuries are consistent with his testimony and reflect at most that he was reckless.  Defendant disputes that he inflicted any injuries on T.S. with the knowledge that he could cause great bodily harm or death.  The proper standard of review of a challenge to the sufficiency of the evidence is well settled:

"A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that a reasonable doubt of the guilt of the defendant remains. [Citation]  Upon a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant. [Citation]  Rather, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. [Citation]  In the consideration of a defendant's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" 
 People v. McLaurin
, 184 Ill. 2d 58, 79 (1998).

A defendant commits knowing first degree murder when in performing the acts that cause the death of another he knows that "such acts create a strong probability of death or great bodily harm to that individual or another."  720 ILCS 5/9-1(a)(2) (West 1998).  The factual determination of whether defendant acted knowingly or with intent may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries. 
 People v. Renteria
, 232 Ill. App. 3d 409, 416-17 (1992)
. 

We find the analysis of 
Renteria
 instructive.  In 
Renteria
, following a bench trial, defendant was convicted of aggravated battery of his 2½  month-old baby.  Defendant admitted that he shook the baby to revive him after he fell off the bed and onto the floor, but denied that he intended to hurt him or acted 
with knowledge that his conduct created a strong probability of great bodily harm.  The medical testimony at trial, however, contradicted defendant's testimony.  Both the State's and defendant's physicians testified that the baby sustained massive brain injuries and retinal hemorrhaging which indicated shaken baby syndrome.  The State's physician testified that "significant shaking" caused the child's injuries and  that the child additionally suffered a skull fracture from a contact injury.  Defendant's physician disagreed that the child sustained a skull fracture, but did not contest the existence of other massive internal injuries within the baby’s head.  Affirming defendant's conviction, the appellate court determined that the medical testimony and the nature of the baby’s injuries supported the trier of fact's conclusion that defendant either intended to harm the child or knew that his actions would cause the infant to sustain great bodily injury. 
 Renteria
, 232 Ill. App. 3d at 417-18.  With regard to defendant's testimony that he did not intend to harm his child, the court reasoned that this testimony created a conflict in the evidence and it was the role of the fact finder to resolve this conflict.  
Renteria
, 232 Ill. App. 3d at 416.  

Other courts have followed the analysis of 
Renteria
.  In 
People v. Rader
, 272 Ill. App. 3d 796  (1995), defendant was convicted of the aggravated battery of his 4½ month-old baby.  Medical testimony revealed that the baby sustained a subdural hematoma to the brain and brain swelling.  The baby's injuries were permanent.  An ophthalmologist specializing in retinal repair testified about massive retinal hemorrhaging.  Like the child in 
Renteria
, the baby in 
Rader
 suffered from shaken baby syndrome and his injuries were therefore consistent with repeated, violent shaking.  
Rader
, 272 Ill. App. 3d at 799.  Defendant, however, told the police that he shook the baby to revive him after he believed the baby was having a seizure.  Defendant also presented evidence from a family member and a friend that they never observed defendant abuse his children and that defendant appeared to be a caring father.  
Rader
, 272 Ill. App. 3d at 800-01.

Defendant argued on appeal that the State failed to present sufficient evidence to support a  knowing or intentional mental state.  Rejecting defendant's argument, the appellate court, as in 
Renteria,
 focused on the permanent and severe injuries that the baby sustained and the medical testimony that only repeated, violent shaking could cause these type of injuries.  
Rader
, 272 Ill. App. 3d  at 805.  The court stated that "[a] rational trier of fact could infer defendant 
must have known
 of the substantial probability of causing injury to [the victim] based on the severity of violence necessary to cause the injuries." 
 Rader
, 272 Ill. App. 3d at 805.  The court further explained that the disparity in size between defendant and his baby provided an evidentiary basis from which "a rational trier of fact could find that defendant must have been aware 
that any violent shaking by him of a tiny infant would have the substantial probability of causing great bodily harm."  
Rader
, 
272 Ill. App. 3d at 805.  Therefore, like the 
Renteria 
court, the 
Rader
 court affirmed defendant's conviction for knowing or intentional harmful conduct to an infant child because the conduct of the defendant together with medical testimony of severe and permanent injuries provided sufficient evidence to prove beyond a reasonable doubt that defendant acted intentionally or knowingly while negating defendant's  contention that he acted with a less culpable state of mind.

In this case, a rational trier of fact could properly infer from the numerous, severe, and fatal injuries to T.S. that defendant knew that his actions created a strong probability of death or great bodily harm.  The record reflects that T.S. sustained substantial head and brain injuries.  The injuries to T.S. included bruising on both sides of his face, retinal hemorrhaging, subdural hemorrhaging and bleeding within the brain, a subdural hematoma, and substantial brain swelling.   Dr. Filkins diagnosed T.S. with shaken baby syndrome and concluded that only a severe and vigorous shaking of T.S. caused the significant retinal and subdural  hemorrhaging within the eyes and brain of T.S.  Moreover, Dr. Filkins testified that bruising on both sides of his face and subgaleal bleeding of the skull demonstrated that, in addition to being shaken, T.S. sustained impact injuries or blunt trauma.  Prior to defendant's taking custody of T.S., three days before his death, T.S. was in good health and had no bruising. 

Dr. Torczynski testified that T.S.’ retinal hemorrhaging was more severe than would likely occur if an infant fell several stories from a building.  We additionally note that Dr. Filkins testified that T.S.' bruising and brain edema indicated recent injuries.  Defendant is a 30-year-old male, 5 feet 6 inches tall and 150 pounds, and the 11-month-old victim was 27 inches long and 19 pounds at the time of his death.  After shaking T.S., defendant recognized that T.S. was injured enough to call 911 and seek medical care which demonstrated his conscious awareness of the severity of T.S.' injuries.

Defendant cites evidence of T.S.' alleged fall down a flight a stairs a week before his death and the fall at defendant's mother's house as explanation for T.S.' severe injuries.  However, both Dr. Filkins and Dr. Torczynski rejected defendant's theory at trial and now on appeal that these two falls accounted for T.S.' severe internal injuries.  Dr. Torczynski testified that it was severe 
shaking
 or a combination of 
shaking and impact 
injuries, and not a fall, that caused the retinal hemorrhaging.  Dr. Filkins acknowledged that a fall could cause bruising and even subgaleal hemorrhaging.  Dr. Filkins, however, testified that the amount of recent bruising and impact injuries sustained to the left, right, and front regions of T.S.' head and the significant brain swelling demonstrated that T.S.' injuries were caused by more than two falls.  Dr. Filkins noted that the substantial bruising was caused by multiple impact injuries that struck T.S. from multiple angles.  Dr. Filkins further testified that T.S. suffered from such severe brain swelling or brain edema that this swelling occurred at the time of his death and would not have been present a week or even a day before his death.  Therefore, the extensive medical testimony together with Dr. Filkins's opinion that T.S. "died because he was beaten up on the day he died" all provide support for the conclusion that defendant committed the offense of first degree murder. 

Defendant also claims that his admission of shaking T.S. to revive him refutes any evidentiary basis to support a finding that defendant knew his conduct created a strong probability of death or great bodily harm.  Defendant gave several statements to various individuals regarding the death of T.S.  He told the firefighter that T.S. fell down stairs the day before, and he told Gooch that T.S. died of an asthma attack.  Defendant also made incriminating statements to ASA Shim, including admitting that his shaking and attempt at mouth-to-mouth resuscitation may have caused T.S. to sustain severe injuries.  Shim further testified that defendant stated that he “killed “ T.S. and requested a gun to shoot himself.  We acknowledge that defendant also denied that he violently shook or struck T.S.  However, we conclude that it was the role of the trier of fact to weigh defendant's contradictory statements and testimony together with the medical testimony and other evidence and determine whether defendant should be believed.  
Rader
, 272 Ill. App. 3d at 805; 
Renteria
, 232 Ill. App. 3d at 416.  We will not disturb the trial court's determinations of credibility and resolution of factual disputes.  There is more than sufficient evidence in this case to support finding defendant guilty of first degree murder beyond a reasonable doubt.

Defendant additionally argues that we should reduce defendant's conviction to involuntary manslaughter as the court did in 
People v. Holmes
, 246 Ill. App. 3d 179 (1993).  In 
Holmes
, a divided Third District Appellate Court reduced defendant’s first degree murder conviction of his infant son to involuntary manslaughter.  The majority found that medical testimony that a “one-time” severe shaking of the infant as the cause of death was insufficient to demonstrate that defendant knew that his conduct created a strong probability of death or great bodily harm. 
 Holmes
, 246 Ill. App. 3d at 181.  The third district, however, has subsequently rejected the 
Holmes
 court’s analysis and instead has followed the holdings of 
Renteria 
and 
Rader. 
 In 
People v. Ripley
, 291 Ill. App. 3d 565 (1997), the third district affirmed a defendant’s conviction for aggravated battery of a child.  Stating that 
Holmes
 was “wrongly decided,” the court reiterated the rules of 
Renteria
 and 
Rader
 and explained that “circumstantial evidence, including medical testimony regarding the severity of the injuries imposed, is sufficient to prove that the injuries were intentionally or knowingly inflicted, even where a defendant testifies that he did not intend to injure the victim.” 
Ripley
, 291 Ill. App. 3d at 569.

Unlike the medical testimony in 
Holmes
, the medical testimony here demonstrated that T.S. was not killed by a one-time shaking but sustained multiple impact and blunt injuries together with a violent shaking.  T.S. had bruising and bleeding within the muscles of his skull and significant brain swelling.  T.S.' retinal hemorrhaging was more severe than would have occurred if he had fallen several stories from a building according to Dr. Torczynski.  It is apparent that T.S. suffered a violent beating while he was in the care of the defendant.  We adhere to the holdings of 
Renteria, Rader,
 and 
Ripley 
that medical testimony of severe and violent injuries to
 
a baby victim can provide circumstantial evidence from which a trier of fact can infer that defendant knew his conduct created a strong probability of death or great bodily harm.  Consequently, based on the totality of circumstances in this case, we conclude that the trial court properly found defendant guilty of the knowing first degree murder of T.S.

Defendant next challenges his sentence of natural life without parole. Defendant was sentenced pursuant to section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections, which prescribes mandatory life imprisonment for any person 17 years or older convicted of murdering a child less than 12 years old, provided that the offender is ineligible for the death penalty.  730 ILCS 5/5-8-

1(a)1(c)(ii) (West 1998).  Defendant argues that this sentencing provision violates the Illinois Constitution's requirement that the legislature set penalties "with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, § 11.  Defendant additionally argues that section 5-8-1(a)(1)(c)(ii) violates the "single subject" rule found in article IV, section 8, of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8).  In 
People v. Wooters
, No. 83595 (November 18, 1999), the court determined that section 5-8-1(a)(1)(c)(ii), enacted as part of Public Act 89-203 (Pub. Act 89-203, eff. July 21, 1995), did violate the single subject rule and was unconstitutional. 
 Wooters
, slip op. at 17.  Therefore, we vacate defendant's sentence and remand for resentencing.  Defendant shall be sentenced under the proper provisions of the Uniform Code of Corrections without application of the amendments enacted within Public Act 89-203, which became effective on July 21, 1995.

We additionally recognize that the General Assembly possesses the exclusive function to declare what conduct is criminal and the penalties for that conduct.  
People v. Taylor
, 102 Ill. 2d  201, 205-06 (1984).  In 
Taylor
, the court held that the legislature properly prescribed a mandatory life sentence for a single murderous act that resulted in the death of two individuals.  
Taylor
, 102 Ill. 2d at 204-05.  
The state constitution directs, when determining a criminal penalty, the legislature rely on the seriousness of a crime in addition to other factors such as the repeated conduct of an offender.  
Wooters
, slip op. at 6-7, citing Ill. Const. 1970, art. I, § 11.  
As recognized in 
Wooters
, the determination by the legislature that an adult convicted of murdering a child receive a mandatory life sentence serves the valid legislative goal of protecting the safety of children. 
 Wooters
, slip op. at 7; 
see also
 
People v. Wheeler
, 299 Ill. App. 3d 245, 254 (1998) (finding that mandatory life imprisonment for the murder of a young child was a similar valid legislative decision as the mandatory life sentence for the repeat murderer in 
Taylor
).  

III. CONCLUSION

For the foregoing reasons, we affirm defendant's conviction for first degree murder, vacate defendant's sentence, and remand for resentencing.

Affirmed in part and vacated in part; cause remanded.

TULLY and GALLAGHER, JJ., concur.