1-99-0740 First Division

September 28, 2001

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 96 CR 9614

)

BERNARD BURNETTE, ) The Honorable

) Marcus R. Salone,

Defendant-Appellant. ) Judge Presiding.

PRESIDING JUSTICE COHEN delivered the opinion of the court:

Defendant Bernard Burnette was charged by indictment with multiple counts of first degree murder, home invasion, armed violence and residential burglary.  After a bench trial, Burnette was convicted of one count of involuntary manslaughter (720 ILCS  5/9-3 (West 1998))
 and one count of home invasion (720 ILCS 5/12-11(1) (West 1996) (now 720 ILCS 5/12-11(3) (West 2000))
 and was sentenced to concurrent prison terms of 5 and 20 years, respectively.  On appeal, Burnette challenges both the sufficiency of the evidence supporting his convictions as well as the basis of his sentence.  We affirm in part and vacate in part. 

1.  
Background

A.  Burnette's Testimony

Burnette testified that he lived in an apartment at 2414 Monticello in Chicago.  The apartment was burglarized twice, on February 13 and March 18, 1996.  Property taken in the burglaries included a television, a stereo system and articles of clothing.  Shortly after the first burglary, while awaiting the repair of his front door, Burnette purchased a .38-caliber handgun and ammunition on the street for $50, "to use as protection."  Burnette testified that on March 19, 1996, he had a telephone conversation with ex-girlfriend Latrice Grant, during which Grant confessed to him that she had burglarized his apartment.  She also told him that he could retrieve his property the following weekend at her apartment at 2321 West Dickens, which Burnette knew Grant now shared with Michael Wells.  Burnette stated that he had known Wells since 1994.  

Burnette testified that on Sunday, March 24, 1996, after first attempting to contact Grant by telephone, Burnette went to her apartment to collect his property.  Burnette testified that his gun was in the pocket of the "Starter" jacket he wore to the apartment.  Burnette denied that he had intentionally taken the gun
 to the apartment, stating that since he purchased the gun
, he had carried it on a continuing basis for personal protection.  Upon arriving at the apartment, Burnette climbed the five steps to the porch and knocked on the back door, which had been his custom while dating Grant.  Wells answered the door, allowing Burnette into the kitchen and leaving him there while Wells walked further into the apartment to notify Grant of Burnette's arrival.  Wells returned shortly, telling Burnette that Grant was busy and that Burnette should return later. As he made his way out the door, Burnette asked Wells to tell Grant that he would be returning later that evening.  As Burnette exited the back door,  Wells closed the door on the fingers of Burnette's left hand, causing pain but no injury.  When Burnette complained, Wells smirked and said that Burnette "should[n't] have had his hand there anyway."  Burnette called Wells a "silly ass," pushed the door back into Wells, and turned to walk away.  As he turned, Burnette heard Wells say, "You motherfucker."  Wells then followed 
Burnette
 out onto the porch and struck him on the back of the neck with his fist.  

A fight then ensued on the back porch.  
Burnette
, who is 5 feet 6 inches tall and weighs approximately 140-150 pounds, testified on direct examination:

"Q.  This struggle that happened at that point, tell the Judge what happened to the best of your ability?

 A.  Well we start.  By him being bigger [5 feet 10 inches, 198 pounds]
 than I was, I went to hit him and he hit me.  I figured if I can go down and grab him by the leg and try to scoop him and flip him, but he was too heavy for me and somehow he, then I went down and he  grabs me in a headlock.

 Q.  A headlock?

 A.  Yeah, and choke hold, whatever you want to call it.

 Q.  What happened next?

 A.  And then we was tussling right there and I am still trying to flip him and somehow we wind up into the kitchen.  I don't know because I got my head down."  

Wells and 
Burnette
 crashed into the cabinets and appliances opposite the kitchen door, with Wells threatening to kill Burnette and Burnette demanding to be released.  During their struggle in the kitchen, Burnette's gun
 fell from his pocket to the kitchen floor, spinning to rest approximately three feet from the back door.  

Burnette then grabbed Wells' testicles, causing Wells to release Burnette from the headlock.  Wells then dove for the gun.  
Just as Wells grasped the gun, Burnette
 kicked Wells' arm, causing the gun to fall to the floor a second time.  Both men then went to their knees and took hold of opposite ends
 of the gun.
  Defense counsel asked Burnette:

[W]hy did you go for the gun as [Wells] was going for it the second time?

I was afraid he might shoot me with it.  He was talking about he was going to 'kill me, nigger.'  'I will kill your ass.'  And I didn't want him shooting me with the gun."

 Burnette testified: "[Wells] grabbed the barrel of the gun and I grabbed the other end of the gun while, you know, I was down on my knees.  And he, and when [Wells] was coming [to his feet] the gun went off."  

Burnette retrieved the gun and ran from the apartment through the kitchen door.  As he ran down the porch steps, he encountered a woman and her daughter, who both started screaming when they saw the gun.  Burnette hastily discarded the gun on a set of stairs leading to the building's basement and ran through an adjoining alley.  

Burnette denied that he had intended to shoot Wells, that Wells had ever tried to bar him from entering the apartment or that he had forced his way into the apartment.

B.  State Witnesses

The State's occurrence witnesses, convicted felons
 Latrice Grant and Dion Nickles, testified that they were present in Wells' apartment on the day of the shooting but offered conflicting accounts of the surrounding
 events.  Grant testified that at 10 p.m.
 on the night before the shooting,
 she and Nickles arrived at Wells' apartment with their baby.  Grant testified that she saw Burnette sitting in a car outside Wells' apartment when she and Nickles arrived that night, but Burnette denied being present at that time.  

Nickles and Grant both testified that at 1:30 p.m. the next day, they were in bed with the baby  in the bedroom of Wells' apartment.  Grant was asleep but awoke to the sound of banging on the back (kitchen) door and the sound of an angry male voice asking, "Where's my shit?"  They then heard Wells reply that he did not know what the man was talking about.  Grant testified that she recognized the angry male voice as Burnette's; however, the parties stipulated that Grant had not identified Burnette to investigating officers as the speaker.  

Nickles testified that he then exited from the bedroom doorway, stepped two to three feet
 into the hall and, from a distance of approximately 20 feet, saw Wells standing with his hands against the back door attempting to hold it closed against someone pushing in from the outside.
(footnote: 1)  Nickles further testified that he heard a gunshot while standing in the hallway, at which point he returned to the bedroom, locked the door behind him and informed Grant that someone was forcing his or her way into the apartment.

Nickles testified that after he returned to the bedroom, he heard people walking around the apartment and the same voice asking, "Where is my shit?"  The bedroom doorknob was rattled and a female voice said, "It's locked."  The bedroom door was then kicked in and Nickles saw Burnette standing at the door and holding a black steel .38-caliber revolver.  A black female with a 9-mm  handgun and a black male with a low-caliber semi-automatic handgun were standing behind and on either side of Burnette.  

Grant also testified that a few seconds after she heard the shot, the bedroom door was kicked in. Burnette and two others, a man and a woman, stood at the doorway holding handguns.  Burnette asked Grant "where his shit was," looked at them, shook his head and left.

Grant denied either having a previous conversation with Burnette about his missing property or knowing what Burnette was talking about when he asked "where his shit was."  Nickles and Grant both testified that they had informed police about seeing three people holding guns when the bedroom door was opened; however, the parties stipulated that Grant had not told the police about seeing anyone with Burnette when the door was kicked open.

Nickles and Grant both testified that they waited in the bedroom for three to four minutes after Burnette left before phoning for assistance for Wells, whom they could hear moaning from the kitchen.  Grant testified that when they reached the kitchen, the oven door was broken and hanging by a single hinge, and that it had been undamaged the previous evening.  Paramedics arrived at 1:31 p.m. and transported Wells to Illinois Masonic Hospital, where he was pronounced dead at 2:10 p.m.

The medical examiner, Dr. Chira, determined on postmortem examination that Wells bled to death as a result of the gunshot wound.  The bullet struck Wells on the front of his left thigh, five or six inches from the groin, severed the left common iliac artery
, traveled on a slight upward angle through Wells' left leg and pelvis, and exited Wells' right leg just below the hip. 
 Dr. Chira testified that there was no stippling, or powder burn, at the site of the entrance wound, indicating that the gun had been at least 18 inches away from Wells' leg when the shot was fired.  Dr. Chira further testified that the path of the bullet was consistent with Wells standing with his hands against the door and someone reaching around the door with a gun and firing blind at Wells; however, Dr. Chira stated, such a scenario was not consistent with the absence of stippling on Wells' body.  According to Dr. Chira, unless Wells had been wearing many layers of clothing -- which he had not, because the police recovered Wells' blood-soaked underwear and walking shorts from the kitchen
 -- stippling would have been present on the body if the shot had been fired from fewer than 18 inches.  The record reflects that no gunshot residue test was performed postmortem
 on Wells' hands.

Upon observing Burnette's automobile near the 
intersection of Courtland and Pulaski, police arrested Burnette and took him to Area 5 headquarters, where he was identified by Nickles, who was at the time being interviewed by a detective in an open office area.  

Former Assistant State's Attorney Nicholas Arvanitis testified that he and Detective Richard Curley met with Burnette at Area 5 around 8:15 p.m. on the day of the shooting.  At that meeting, Burnette gave an oral statement in which he told Arvanitis about the burglaries, related his suspicions regarding Wells and Grant, described purchasing the gun and explained that he took the gun to the apartment to confront Wells and Grant about the missing property.  

According to Arvanitis,
 Burnette said that he had asked Wells for permission to use the washroom as a means of gaining entry into the apartment.  Wells refused him entry and attempted to slam the door closed, trapping Burnette's hand against the doorjamb.  Burnette then drew his gun to frighten Wells.  Wells grabbed the barrel of the gun, a struggle ensued in the doorway and the gun discharged.  Burnette then entered the apartment in search of his property and saw Grant, a baby and a man whom he did not recognize in the bedroom.  Unable to locate his property, Burnette then left the apartment.  

The parties stipulated that Detective Curley would testify that prior to speaking to Arvanitis, Burnette had made a substantially similar
 oral statement to Curley.  On cross-examination, Burnette denied telling either Curley or Arvanitis that Wells had refused to allow him entry into the apartment.  Defense counsel objected, noting that the word "refused" appeared nowhere in the State's felony review memorandum.  Burnette further denied telling either Arvanitis or Curley that he had asked to use the washroom in order to gain entry to the apartment or that he had ever drawn his gun in order to frighten Wells.  Burnette testified that he had told Curley and Arvanitis that he and Wells were struggling for the gun when it discharged, but that he did not go into detail with either of them.

C.  Findings of the Trial Court

The trial court found Burnette not guilty of first degree murder.  The court did, however, find Burnette guilty of involuntary manslaughter.  The court noted that the testimony of Nickles and Grant was inconsistent regarding their respective locations in the apartment at the time the shot was fired.  The court also noted that Wells' wound was "consistent with the struggle as demonstrated by Mr. Burnette" and that "photographs of the scene [were] consistent with Mr. Burnette's theory of what occurred."  The court predicated its 
finding of guilty as to involuntary manslaughter on the following:

"THE COURT:  Mr. Cohen, advocate that he is, suggests that this Defendant could not even be guilty of involuntary manslaughter and presented cases in support of his argument.  Those cases I believe to be distinguishable from the facts in this case.  As I have previously said, Mr. Burnette armed himself and went to that apartment and obviously went with some animosity and I think one could reasonably conclude that Mr. Burnette was also fortified with the knowledge that he carried this handgun.

In the cases that Mr. Cohen relies upon, the opinion[s] suggest[] that one could not be found guilty of an involuntary manslaughter as the result of the loss of life which occurred not the fault [of] or not attributable to the Defendant.  Mr. Burnette armed himself.  Certainly that -- the victim would not have been murdered by a handgun if Mr. Burnette had not brought that handgun to the scene.  If the Appellate Court is prepared to -- to suggest that this involuntary taking of life was not the doing of Mr. Burnette, so be it.  It defies logic.  How one could lose a component system, television equipment, electronic equipment, anything of personalty and respond by arming himself is idiotic.  It defies common sense and I do not believe lends itself to an exemption at law.

Accordingly the Court finds the Defendant guilty of involuntary manslaughter."         

The court also found Burnette guilty as to one of the three counts of home invasion, which alleged  that "[Burnette], not being a police officer acting in the line of duty, without authority knowingly entered the dwelling place of Michael Wells and he had reason to know that one or more persons were present therein, and while armed with a dangerous weapon, to wit: a handgun did use force upon Michael Wells, within said dwelling place, whether or not injury occurred."  
720 ILCS 5/12-11(1) (West 1996) (now 720 ILCS 5/12-11(3) (West 2000).

Following trial, the court denied defense counsel's motion to reconsider its verdict.  When defense counsel questioned the court's finding of guilty as to home invasion, the court stated, "[Burnette] was outside the apartment.  He engaged in a tussle.  He pushed [Wells] back into the apartment."  The court also quoted Burnette as testifying that, "[he] could grab [Wells] down low or something, push him back into the apartment." 

The court rejected Burnette's claim of self-defense, stating that it did not believe that Burnette forgot that he was carrying the gun when he went to the apartment to recover property from someone he knew to be physically larger than himself.  The court also roundly criticized Burnette for purchasing a gun after the burglary rather than having his door repaired.  Referring to Arvanitis' testimony that Burnette admitted to him that Burnette had pushed the door back on Wells after Burnette's hand was caught in the door, the court concluded, "Now because you pinched my finger I hit you with the door.  All of this approaches self-defense.  I don't think so.  It is a return to a time before Dodge City, if you adopt that line of thinking.  I am not prepared to go back that far."    

The court then sentenced Burnette to concurrent prison terms of 5 and 20 years for involuntary manslaughter and home invasion, respectively.  Three months after trial, the court denied Burnette's motion for reconsideration of his sentence.  This appeal followed.

2.  
Analysis

A.  Home Invasion

Burnette first argues that the evidence adduced at trial was insufficient to support his conviction for home invasion where "[t]here [was] no evidence that [he] made any conscious attempt to enter the apartment during the struggle."  Burnette argues that in light of his trial testimony -- that he and Wells "somehow [wound] up into [
sic
] the kitchen" during a struggle which began on Wells' back porch -- the State failed to prove beyond a reasonable doubt the element of "knowing" entry
 necessary to support a conviction for home invasion.   

We first consider the proper standard of review of a challenge to the sufficiency of evidence supporting a criminal conviction:

"'A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that a reasonable doubt of the guilt of the defendant remains.  [Citation.]  Upon a
 challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant.  [Citation.]  Rather, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact.  [Citation.]  In the consideration of a defendant's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]'"
  
People v. Coleman
, 311 Ill. App. 3d 467, 473 (2000), quoting 
People v. McLaurin
, 184 Ill. 2d 58, 79 (1998).

See also
 People v. Thompson
, 313 Ill. App. 3d 510, 515 (2000).
  The relevant section of the home invasion statute then in effect reads as follows:

"A person who is not a peace officer
 acting in the line of duty commits home invasion when without authority he * * * 
knowingly
 enters the dwelling place of another when he * * * knows or has reason to know that one or more persons is present * * * and

1)  While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs[.]"  (Emphasis added.)  720 ILCS 5/12-11(1) (West 1996) (now 720 ILCS 5/12-11(3) (West 2000).
(footnote: 2)
 The record plainly contradicts Burnette's assertion that there was "no evidence" that his entry into Wells' apartment was "knowing" within the meaning of the home invasion statute.  The trial court made no specific finding as to Burnette's mental state upon entry into the apartment; however, in addition to Burnette's self-serving testimony, the record contains the trial testimony of former assistant State's attorney Nick Arvanitis.  Arvanitis testified that in Burnette's oral statement to him at Area 5 police headquarters, Burnette admitted to struggling with Wells on the back porch of the apartment.  According to Arvanitis, Burnette further admitted to voluntarily entering the apartment in search of his missing property after the fatal shot was fired.  The record also contains the parties'

stipulation that, if called as a witness, Detective Richard Curley would testify that prior to Burnette's interview with Arvanitis, Burnette gave a substantially similar oral statement to Curley.  Determinations as to the credibility of witnesses and the weight given their testimony are the province of the trier of fact.  
Coleman
, 311 Ill. App. 3d at 473.  Nothing in the law requires the trier of fact to believe a defendant's exculpatory testimony.  
People v. Johnson
, 227 Ill. App. 3d 800, 806 (1992);
 People v. Berryman
, 171 Ill. App. 3d 548, 557 (1988), 
appeal denied
 123 Ill. 2d 560 (1988).  Considering the totality of the evidence in the light most favorable to the prosecution, a rational finder of fact could have readily
 found that the State had proved the essential elements of home invasion, including the "knowing" nature of Burnette's entry into the apartment, beyond a reasonable doubt.  
Coleman
, 311 Ill. App. 3d at 473. 

Burnette next argues that the guilty verdict as to home invasion was predicated on the trial court's "flawed recollection" of the evidence with respect to his mental state upon entering the apartment
 and that he should therefore be granted a new trial.  It is critical to understand that what  Burnette characterizes as the court's "flawed recollection" was adduced three full months following trial during the hearing on Burnette's motion for reconsideration and for a new trial. 
 At that hearing,
 in response to defense counsel's argument that there was no evidence that Burnette had knowingly entered the apartment, the court stated
:

"THE COURT:  He was outside the apartment.  He engaged in a tussle.  He 
pushed
 the gentleman back into the apartment.

* * *

THE COURT:  [Ostensibly quoting Burnette's testimony]  'I suggest I could grab him down low or something, 
push
 him back into the apartment.'"  (Emphasis added.)

Actually, Burnette testified that during the struggle, he was "still trying to flip [Wells] and 
somehow
" they ended up in the kitchen.  (Emphasis added.)  Burnette also testified that he was unsure exactly how they had managed to enter the kitchen because he "had [his] head down" at that point in the fight.    

Burnette cites two cases in support of his argument.  Neither is on point.  Both cases involve a trial court's misapprehension of the evidence
 prior
 to a finding of guilt.  See 
People v. Mitchell
, 152 Ill. 2d 274, 321-26 (1992) (court  incorrectly recalled defendant's testimony during hearing on pretrial motion to suppress evidence); 
People v. Bowie
, 36 Ill. App. 3d 177, 179-80 (1976) (court misstated defendant's testimony during defendant's closing argument).

The court's flawed post-trial recollection of Burnette's testimony
 does not vitiate the court's initial finding of guilt, which was made three months earlier at a time when the evidence was necessarily fresher in the court's mind.  This is not error of sufficient magnitude to merit vacating Burnette's conviction.
 
 After a careful review of the record, we conclude that 
Burnette's challenge to the sufficiency of the evidence supporting his conviction for home invasion is without merit.

B.  Involuntary Manslaughter

After trial, the court found Burnette not guilty of first degree murder, apparently accepting Burnette's assertion that he had killed Wells unintentionally during a struggle.   However, the court found Burnette guilty of involuntary manslaughter predicated on Burnette's recklessness in bringing a gun to a potentially dangerous confrontation.
 
 According to the trial court, "
the victim would not have been murdered by a handgun if Mr. Burnette had not brought that handgun to the scene.
"
(footnote: 3)  

The Criminal Code of 1961 (720 ILCS 5/1-1 
et seq
. (West 1998)) (the Code) defines involuntary manslaughter as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly * * * ."  720 ILCS 5/9-3(a) (West 1998).

"The crux of involuntary manslaughter is recklessness."  
People v. Tainter
, 304 Ill. App. 3d 847, 849 (1999). 

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."  720 ILCS 5/4-6 (West 1998).

Thus, "[f]or purposes of involuntary manslaughter, a person acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to another."  
People v. Castillo
, 188 Ill. 2d 536, 540-41 (1999).  

We believe that the trial court misconstrued the involuntary manslaughter statute in predicating Burnette's conviction solely on his recklessness in bringing the gun to Wells' apartment. The trial court ignored the fact that the State was required to prove beyond a reasonable doubt that Burnette was reckless in performing those "acts * * * which
 cause[d] the death
."  
(Emphasis added.)  720 ILCS 5/9-3(a) (West 1998).  
The question here is one of proximate cause.  Wells died not because Burnette brought the gun to his apartment, but because he was 
shot 
when the gun discharged during the struggle in the kitchen.  Although this may ostensibly appear to be a distinction without a difference, it is a critical one under the facts before us.  The trial court credited Burnette's account of the struggle that resulted in the shooting, stating prior to passing sentence that both Wells' wound and the photographs of the scene of the shooting were "consistent with the struggle as demonstrated by Mr. Burnette."
  The court made no specific finding prior to sentencing as to whether Burnette ever drew the gun or purposefully introduced it into the fight.  However, during the hearing on
 Burnette's motion for a new trial, in discussing with counsel Burnette's entry into the apartment, the court stated that "[Burnette] did not use the gun in a way that was visible to [Wells]."  Inherent in the findings of the trial court is the determinative conclusion that the gun did not appear until it fell from Burnette's jacket by accident during the struggle in the kitchen, as Burnette had testified.  This is not a case in which a defendant deliberately drew a handgun and brought it into play during a fight (
People v. Hoover
, 250 Ill. App. 3d 338, 351 (1993), 
appeal denied
, 153 Ill. 2d 564 (1993)) or deliberately pointed a loaded gun at another while intoxicated (
People v. Castillo
, 188 Ill. 2d 536,  544 (1999) (Harrison, J., dissenting)).  The trial court was required to find Burnette reckless at the time of the shooting -- the "act[] * * * which cause[d] the death" -- in order to convict Burnette of involuntary manslaughter.  720 ILCS 5/9-3(a) (West 1998).  See 
People v. Tainter
, 304 Ill. App. 3d 847, 851 (1999) (holding that the nature of the beating that defendant inflicted on the victim would be dispositive of the recklessness of the defendant's actions); 
People v. Kolzow
, 301 Ill. App. 3d 1, 6-7 (1998) (finding that where a three-month-old
 infant victim died of heatstroke,
 the defendant was reckless in leaving the infant locked in an automobile for four hours on a hot summer day);
 and 
People v. Cole
, 253 Ill. App. 3d 603, 610 (1993) (stating that defendant was reckless in first firing a loaded gun near victim, then pointing what the defendant thought to be an unloaded gun at victim and pulling the trigger, allegedly merely to frighten victim but in reality shooting victim to death).

Because a conviction may be affirmed on any basis in the record, even if the circuit court did not rely on those grounds (
People v. Wright
, 194 Ill. 2d 1, 16 (2000)), we examine the record in order to analyze Burnette's conduct at the time of the shooting and determine whether it was reckless within the meaning of the involuntary manslaughter statute.     

Based on the evidence credited by the trial court, the gun fell from Burnette's pocket in the kitchen during his struggle with Wells.  Wells reached the gun first, but Burnette kicked it from his hand.  Both men then dove for the gun, reaching it at the same time.  When asked why he then reached for the gun, Burnette replied, "I was afraid [Wells] might shoot me with it.  He was talking about he was going to 'kill me, nigger.'  'I will kill your ass.'  And I didn't want him shooting me with the gun."  In convicting Burnette of involuntary manslaughter, the trial court accepted Burnette's statement that the firing of the gun was unintentional.  720 ILCS 5/9-3(a) (West 1998).
  Logically, then, the killing must have been the result of either recklessness or accident.  

The determination of whether a killing has resulted from reckless conduct is a question for the trier of fact and will not be disturbed unless it is "palpably contrary to the weight of the evidence."  
Hoover
, 250 Ill. App. 3d at 351. 
 The trial judge, sitting as the finder of fact, accepted Burnette's account of the struggle that resulted in the shooting.  After a careful review of the record, we hold that
 the trial judge's subsequent determination that Wells died as the result of recklessness 
is contrary to the manifest weight of the evidence.
  Burnette's recklessness in bringing the gun to the apartment was too attenuated with respect to the shooting itself
, the "act which cause[d] the death," to support an involuntary manslaughter conviction.  720 ILCS 5/9-3(a) (West 1998).
  The State failed to prove beyond a reasonable doubt that Burnette was reckless at the time of the shooting.  Burnette's conviction on the charge of involuntary manslaughter is therefore vacated.
(footnote: 4)  

C.  Double Jeopardy

Burnette further challenges his conviction of home invasion on the grounds that the trial court acquitted him of home invasion and was barred thereafter from convicting him on that charge by the constitutional prohibition against double jeopardy.  Double jeopardy prohibits a defendant from being prosecuted for an offense after having been acquitted of that same offense.  U.S. Const., amend. V; Ill. Const 1970, art. I, §10.  An acquittal triggers the double jeopardy bar only if it "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged."  
United States v. Martin Linen Supply Co.
, 430 U.S. 564, 571, 51 L. Ed. 2d  642, 651
, 97 S. Ct. 1349, 1355 (1977); 
People ex rel. Daley v. Crilly
, 108 Ill. 2d 301, 311 (1985).  Whether jeopardy has actually attached under a given set of circumstances is a question of law that we review 
de novo
.  
People v. Johnson
, 304 Ill. App. 3d 599, 601 (1999).       

The indictment in this case charged Burnette with three counts of home invasion, each tracking a different part of the language of the statute.  Counts VIII, IX and X alleged, respectively, that Burnette "use[d] force upon," "threaten[ed] the imminent use of force upon
," and "intentionally injured" Michael Wells.  720 ILCS 5/12-11(1), (a)(2) (West 1996) (now 720 ILCS 5/12-11(2), (a)(3) (West 2000).
  Burnette rests his double jeopardy claim upon the following exchange between the trial court and the prosecutor:

"THE COURT:  
[T]here's a finding of not guilty as to the second count alleging as follows
: 'That he not being a police officer acting in the line of duty without authority knowingly entered the dwelling place of Michael Wells and he had reason to know that one or more persons were present therein and while armed with a dangerous weapon, to wit, a handgun, did 
use force
 upon Michael Wells within said dwelling place, whether or not injury occurred.'  
Finding of guilty.

MR. HOLZMAN:  
Judge, there's a finding of guilty?

THE COURT:  
There's a finding of guilty.  
And as to the third and last home invasion count there's a finding of not guilty."  (Emphasis added.)

A thorough reading of the record reveals Burnette's claim to be without merit.  The trial court was initially under the mistaken impression that counts IX and X were the only two counts of home invasion pending.  When the existence of count VIII was brought to its attention, the court ruled that Burnette was guilty of home invasion predicated on the use of force against Wells.  To the extent that the court inadvertently made statements suggesting a finding of not guilty as to count VIII, those statements were immediately corrected by the court's unequivocal statements to the contrary.  

Double jeopardy protects against the harassment of successive prosecutions.  
People v. Williams
, 188 Ill. 2d 293, 307 (1999).  Such concerns are not implicated where, as here, the trial court makes an inadvertent statement and then corrects it "virtually with the same breath."  
People v. Vilt
, 119 Ill. App. 3d 832, 835 (1983).  The trial court's statement did not represent a resolution of "some or all of the factual elements of the offense charged."
  Martin Linen Supply Co.
, 430 U.S. at 571, 51 L. Ed. 2d  at 651,
 97 S. Ct. at 1355; 
Crilly
, 108 Ill. 2d at 311.  Burnette's double jeopardy claim must fail.

D.  Sentencing

1.  Mitigation

Burnette challenges his sentence on multiple grounds.  Burnette first argues that this court should reduce his 20-year sentence for home invasion
(footnote: 5) to the minimum term of imprisonment
 of 6 years predicated on the trial court's failure to take into account in mitigation both the "unusual" circumstances surrounding the offense and his own rehabilitative potential.

Where the sentence imposed is within the permissible statutory range for the offense of which the defendant was convicted, we may reduce the sentence only where its imposition was an abuse of discretion.  
People v. Juarez
, 278 Ill. App. 3d 286, 293 (1996).  Home invasion is a Class X felony with a sentencing range between 6 and 30 years.  730 ILCS 5/5-8-1(a)(3) (West 1998).  We accord the trial court great deference with respect to its role in balancing factors in mitigation and aggravation in order to craft a proper sentence.  
People v. Illgen
, 145 Ill. 2d 353, 379 (1991).  In the absence of evidence to the contrary, we generally presume that the trial court considered any mitigating evidence before it. 
 People v. Burton
, 184 Ill. 2d 1, 34 (1998).

Burnette argues by way of "unusual" circumstances that: (1) he acted only in response to the "strong provocation" of the burglary and that such a circumstance is unlikely to recur (730 ILCS 5/5-5-3.1(a)(3) (West 1998)); and (2) he had no intention of threatening or causing physical harm in acting as he did (730 ILCS 5/5-5-3.1(a)(2) (West 1998)).  
However, Burnette points to nothing in the record that might indicate that the trial court failed to consider these factors in mitigation.  We therefore defer to its judgment in this respect.  
Burton
, 184 Ill. 2d at 34.

Burnette also argues that the trial court failed to consider in mitigation his rehabilitative potential as evidenced by his lack of a criminal record.  The court stated for the record prior to sentencing Burnette that it had considered Burnette's lack of criminal record in mitigation.
  Defense counsel then moved for reconsideration of Burnette's sentence.  Three months later, during a hearing on counsel's motion, counsel argued that the court had failed to give Burnette's lack of a criminal record
 adequate weight in mitigation.  The court responded:

"Mr. Cohen, Mr. Burnette, I am mindful of the absence of the criminal background up to this point.  And, in terms of those that I see on a daily basis, that is unique.

But I am also mindful that for every person that I see, there are, if you want to argue the statistics or accept the statistics, there are at least another two-thirds or 66% more people who walk the streets and manage to complete their entire adult life without any criminal sanctions.

So, if we are to measure Mr. Burnette's lack of criminal background on the standard or scale of criminals, his is remarkable.  But in terms of citizens at large, he is in one hell of a position." 

Predicated on this comment, Burnette argues that rather than considering Burnette's lack of a criminal record in mitigation, the court inexplicably deemed it at best a neutral factor, and at worst actually viewed it in aggravation.  We disagree.  

The trial court has a statutory duty to consider evidence in mitigation in crafting a just sentence.  730 ILCS 5/5-5-3.1(a)(7) (West 1998) ("The following grounds 
shall
 be accorded weight in favor of withholding or minimizing a sentence of imprisonment * * * ") (emphasis added); 
 Burton
, 184 Ill. 2d at 34; 
People v. Spencer
, 229 Ill. App. 3d 1098, 1102 (1992) (holding that the court cannot ignore pertinent factors in mitigation).  Prior to sentencing Burnette, the trial judge explicitly stated on the record that he had considered in mitigation Burnette's lack of a criminal record.  Without more, the trial judge's
 comments three months after sentencing are insufficient to overcome the presumption that the trial judge properly considered all evidence in mitigation at the time of sentencing.  
Burton
, 184 Ill. 2d at 34.  We find Burnette's argument that the trial court failed to consider mitigating evidence in passing sentence to be without merit.

2.  Aggravation

Burnette also argues that the trial court improperly considered both elements of the charged offense and the race of the victim as factors in aggravation.  Consideration of improper factors in sentencing has been treated as both a form of abuse of discretion (
People v. Beck
, 295 Ill. App. 3d 1050, 1066 (1998); 
People v. McPhee
, 256 Ill. App. 3d 102, 114 (1993); 
People v. Burge
, 254 Ill. App. 3d 85, 91 (1993)) as well as an independent basis for reversal 
(
People v. Morgan
, 306 Ill. App. 3d 616, 633 (1999)).  We prefer the approach followed in 
Morgan
, for to treat the consideration of improper factors in sentencing as an abuse of discretion seems flawed.  How may a court have discretion to consider a factor that is -- by its very nature -- excluded from such consideration?   

Where a defendant claims that the trial court considered improper factors in sentencing, there is a rebuttable presumption that the sentence was proper.  The burden is on the defendant to affirmatively demonstrate error.  
People v. Lindsay
, 263 Ill. App. 3d 523, 533 (1994).  Note, however, that not every instance in which an aggravating factor is improperly considered in sentencing calls for automatic reversal.  "When the weight placed on an improperly considered aggravating factor is so insignificant that it did not lead to a greater sentence, a remand for resentencing is not required."  
Burge
, 254 Ill. App. 3d at 91.

"As a general rule, the consideration of a factor which is necessarily implicit in an offense cannot be used as an aggravating factor in sentencing." 
 Burge
, 
254 Ill. App. 3d at 88.  However, this rule should not be applied rigidly.  
People v. Saldivar
, 113 Ill. 2d 256, 268-69 (1986).
  Burnette first argues that the trial court improperly considered Wells' death in sentencing him because the death of the victim is an element of involuntary manslaughter.  Although we have otherwise disposed of Burnette's conviction, we note that the trial court never stated that it was considering Wells' death in aggravation in sentencing Burnette for involuntary manslaughter.  However, death of a victim is not an element of home invasion and may properly be considered in aggravation in sentencing a defendant for that offense.  
People v. McGlasson
, 219 Ill. App. 3d 252, 254-55 (1991).  

Burnette's second argument along these lines is also flawed.  Burnette asserts that because being armed is an element of the offense of home invasion, 
the trial court improperly considered in aggravation the fact that he was armed with a gun.  Burnette misstates the issue.  The home invasion statute in effect at the time of the offense required not only that a defendant be "armed," but that he be "armed with a dangerous weapon."  720 ILCS 5/12-11(1) (West 1996) (now 720 ILCS 5/12-11(3) (West 2000)
.  The State argues that
 the trial court was allowed to consider the gun in aggravation under the previous version of the statute as one of the deadliest of 
"dangerous weapons."  We agree.  A firearm is undoubtedly a "dangerous weapon" within the meaning of the statute in effect at time of trial.  
People v. Maberry
, 193 Ill. App. 3d 250, 264 (1990); 
Burge
, 254 Ill. App. 3d at 90.  However, a kitchen knife is also a "dangerous weapon."  The trial court was certainly allowed to consider in aggravation the degree of danger presented by the type of weapon used in the offense.  See 
People v. Gray
, 212 Ill. App. 3d 613, 617 (1991) (holding that a defendant's use of a sawed-off shotgun, one of the most dangerous of weapons, in committing an armed robbery was a proper factor to be considered in aggravation).  We therefore cannot say that the trial court improperly considered in aggravation an element of the offense of home invasion in passing sentence.

Finally, Burnette  argues that the trial court improperly considered in aggravation the race of the victim.  In ruling on defense counsel's motion for reconsideration of sentence, the trial court stated:

"THE COURT:  If this had happened in Auburn and not in Austin, everybody would be up in arms, 'How dare you.'  I am not prepared to minimize the life of this young man and suggest oh, well, you know, look at what happened.  If the victim had been a member of the majority community, we would not be here talking about  'Oh, this is just an aberration.'  

* * *

THE COURT:  It would not be accepted on the North Side of the city.  That kind of thinking would not be accepted on the North Side of the city.  Should not be accepted on the West Side of the city.
  

MR. COHEN:  I don't mean -- I don't.

THE COURT:  You know exactly what I am talking about.

MR. COHEN:  Yes, sir.

THE COURT:  I am not going to minimize the life or the value of that victim to any less degree than I would the life or value of a victim from Lincoln Park.  It happens all the time.  Never in this courtroom.  Never.  Everybody is dealt the same hand."    

In support of Burnette's sentence
, the State makes the disingenuous
 argument that the trial court's references to different areas of the city were comments on the relative affluence of the residents and not their race.  This argument is belied by the trial court's reference to the "majority community," a reference commonly used with respect to race.  The trial judge then commented to defense counsel that "You know exactly what I am talking about."
  We also are aware of the trial judge's meaning, and find that such comments clearly raised the question of the race of the victim.

Despite the trial judge's otherwise laudable aim of informing the parties that Burnette's sentence would be determined in a race-neutral manner, we must admonish the trial judge to refrain from commentary on the record that might be misconstrued. 
 Notwithstanding, we refuse to read into the trial judge's comments any meaning other than that plainly stated: the trial judge merely emphasized that although the deaths of minorities might elsewhere be minimized, he would not allow the race of the victim to affect his sentencing decisions.  This is an accurate statement of the law.  
"The sentencing judge 'owes the same duty to the defendant to protect his own mind from the possible prejudicial effect of incompetent evidence that he would owe in protecting a jury from the same contaminating influence.'"  
Wardell
, 230 Ill. App. 3d at 1103, quoting 
People v. Riley
, 376 Ill. 364, 369 (1941). 

After a careful review of the record, we conclude that the trial court did not improperly consider in aggravation the race of the victim.
  Burnette has failed to carry his burden in affirmatively demonstrating prejudicial error in sentencing.  
Lindsay
, 263 Ill. App. 3d at 533.

E.  Mittimius

Burnette argues, and the State concedes, that the mittimus must be corrected to accurately reflect his convictions.  A corrected mittimus shall therefore issue reflecting Burnette's conviction on count VIII of the indictment
 (home invasion under section 12-11(1) (720 ILCS 5/12-11(1) (West 1996)
)).  134 Ill. 2d R. 615(b)(1); 
People v. Kyles
, 303 Ill. App. 3d 338, 345 (1998).

Conclusion
 

For the foregoing reasons, we vacate
 Burnette's conviction of involuntary manslaughter
 but otherwise affirm the judgment of the trial court.

Affirmed in part and vacated in part.

TULLY and COUSINS, JJ., concur.

FOOTNOTES
1:  The record contains contradictory testimony on the respective positions of Nickles and Grant in the apartment at the time of the gunshot.  Grant testified that when she heard the shot, Nickles returned to the bedroom and locked the door.  At a pretrial suppression hearing, however, Grant testified that Nickles had returned to the bedroom and that she had locked the door before the shot was fired.  Similarly, Grant testified before the grand jury that she had closed the bedroom door when she heard a "banging" noise coming from the kitchen and had locked the door at "some point."  On cross-examination at trial, however, Grant denied making such a statement, even when confronted with a transcript of the grand jury proceedings.  

2:  Since 1996, the home invasion statute has been amended to separately address offenses committed "while armed with a firearm" (as opposed to any other dangerous weapon), and to add a mandatory sentence enhancement of 15 years in such cases.  Under the amended statute, a defendant who personally 
discharges
 a firearm during the commission of such an offense is faced with a mandatory sentence enhancement ranging from 20 years to natural life in prison.  Pub. Act 91-404, § 5, eff. Jan 1, 2000 (amending 720 ILCS 5/12-11(West 1996)).

3:  In support of the trial court's finding of recklessness, the State relies on 
People v. Robinson
, 68 Ill. App. 3d 687 (1979), for the proposition that the "rule of the gun" should not be allowed to supplant the "rule of reason" in Illinois.  
Robinson
, 68 Ill. App. 3d at 691.  Although we agree with the sentiment, we fail to see the relevance of the cited case.  
Robinson
 addresses whether one is permitted to use force to retake money lost as the result of illegal gambling or whether such conduct constitutes armed robbery.  
Robinson
, 68 Ill. App. 3d at 688-89.  As such, 
Robinson
 is of no help to us in deciding the case at bar.

4:  Based on our disposition of this matter, we do not reach Burnette's arguments with respect to self-defense.  

5:  As we have otherwise disposed of Burnette's involuntary manslaughter conviction, we consider his sentencing arguments with respect to home invasion only.