2022 IL App (1st) 200990-U

FIFTH DIVISION
June 3, 2022

No. 1-20-0990

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18 CR 12911 |
| | ) | |
| MICHAEL PORTER, | ) | |
| | ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Cunningham concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The circuit court correctly denied defendant's request for a lesser-included offense jury instruction. Defendant's sentence is not so excessive that it amounted to an abuse of the circuit court's discretion. Affirmed.

¶ 2   Following a jury trial, defendant Michael Porter was convicted of aggravated arson and sentenced to 11 years' imprisonment. On appeal, defendant contends that (1) the circuit court erred in denying his request for a jury instruction on the lesser-included offense of  criminal damage to property, and (2) his sentence is excessive. We affirm.

¶ 3                                    BACKGROUND

¶ 4     Defendant was charged by indictment with five counts of aggravated arson (720 ILCS 5/20-1.1 (West 2018)) in connection with a confrontation with his wife in the early morning hours of August 12, 2018.  The indictments all alleged that defendant "when in the course of committing arson, by means of fire, knowingly damaged the building, damaged the window and wall of the apartment located at 1668 West Juneway Terrace, Chicago, Cook County, Illinois and knew or reasonably should have known that one or more persons were present therein."  The State proceeded to trial on four of the five counts, and the following evidence was adduced at trial.

¶ 5     Rosalind Porter testified that she had been defendant's wife for the previous 16 years, and on August 12, 2018, she lived in a third-floor apartment in the 1600 block of West Juneway Terrace in Chicago.  Rosalind stated that she had three children with defendant:  Michael Jr., Malachi, and Zhane, who were around 14, 12, and 1 years old in August 2018, respectively.  Rosalind also had two older children from a prior relationship.  Rosalind, her five children, and her childhood friend, Anthony Dixon, were in the apartment at the time of the incident.

¶ 6     Between 4 and 5 a.m., Rosalind stated that Michael Jr. came into her bedroom and told her that defendant was sitting outside of his bedroom window with "fire in his hand."  Rosalind then ran to the bedroom and saw defendant standing outside of the window with a burning rag in his hand.  When the State asked what defendant did with the rag, Rosalind responded, "He just had it in his hand at the window."  Rosalind added, "I took the rag and pulled it into the corner of the window.  And then I went in the bathroom and hurried up and put it out."  The State asked whether the rag was inside the building when she saw it.  Rosalind responded, "When [defendant] was standing there, it was, like, right at the screen, but I could easily reach it."  Rosalind added that defendant was "just standing with it," and she took the rag, "pulled it in," and extinguished the

fire. In response to the State's question regarding whether there was any damage from the burning rag inside of the house, Rosalind stated that there was no "real damage," only a "smudge on the wall" resulting from the time it took her to get water from the bathroom and put out the fire. After extinguishing the fire, Rosalind threw the rag in the garbage. According to Rosalind, defendant then told her that he would be back. After defendant left, Rosalind got the kids back to bed and then went to her room, where she sat "trying to process it all in because I just knew something was wrong because [defendant] would never do that."

¶ 7    About half an hour later, Malachi went to Rosalind and told her that defendant was back outside on the back porch. Rosalind went outside and saw defendant, who was shirtless, drop a shirt that was on fire onto the ground. Rosalind again went into the house, got water, returned, and extinguished the fire. Rosalind tried to talk to defendant this time, but she said that defendant was "out of it," explaining that defendant was pacing and would walk away from her if she tried to approach and speak to him. Rosalind then called the police because she knew something was wrong and wanted to get defendant some help, but she did not know what else she could do.

¶ 8    On cross-examination, Rosalind stated that she and defendant were separated at the time of the offense, but defendant was the primary caretaker of the children, allowing Rosalind to work. Rosalind agreed that defendant would see the children and also take them to school and spend time with them. Rosalind further noted that the children went to bed at around 9 p.m., and she went to her room at around midnight but was up all night talking until 7 a.m. the next morning with Dixon. Rosalind acknowledged that she later found out that Dixon, whom she would see very rarely, had a prior conviction for predatory criminal sexual assault of a child. Rosalind further confirmed that defendant was standing outside with a rag in his hand that was on fire but that he was not reaching through the window. Rosalind also reiterated that she reached through the ripped screen on the

3

bedroom window, grabbed the rag because she did not want defendant to burn himself, and "pulled it inside." She agreed that she did not call the police after this first incident because she knew defendant would not hurt her or her children and had never done so in the past.

¶ 9 Rosalind confirmed that, when defendant returned about half an hour later holding on to a shirt that was on fire, defendant dropped the shirt onto the ground as soon as she ran outside and that the fire never came inside of the house. Rosalind further explained that when she was trying to speak to defendant, defendant did not "look like himself" and would "walk[] back" as if he were scared of Rosalind when she would try to speak to him. She said that he was not responsive to her attempt to speak to him, so she went inside to call the police only "to get him help." When she returned, defendant had gone downstairs in the front of the building.

¶ 10 On redirect examination, Rosalind agreed that she had given a videorecorded statement to a police detective and an assistant State's Attorney. Rosalind, however, did not remember telling them that the fire was "on the inside" when she extinguished it. The State asked her, "You didn't tell them that you pulled the cloth from outside inside, did you, ma'am?" Rosalind responded that she could not remember.

¶ 11 Malachi then testified that he was 13 years old at the time of trial and defendant's son. On August 11-12, 2018, Malachi stated that he lived with his mother, Rosalind, and his siblings in an apartment on the 1600 block of West Juneway Terrace. Malachi said that, on August 11, 2018, he went to sleep in his bedroom with his older brother Michael in their bedroom, which was in the back of the apartment and had a window that faced directly onto the back porch. At some point, Michael woke Malachi up, and Malachi testified that he saw that "[t]he window was on fire." Malachi explained that the fire was "inside" of their bedroom, so he moved away from the window to the other side of the room. According to Malachi, Michael left to tell Rosalind, and Rosalind

4

quickly came into the room and put out the fire with water. Malachi saw defendant standing on the back porch, but Malachi did not see defendant speak to anyone, and defendant eventually left. Later that same evening, Malachi saw defendant return. Malachi then went to tell his mother that his father had returned because "the porch was on fire."

¶ 12 Chicago police officer Melissa Rothstein then testified that she and her partner were called to the scene of a domestic disturbance at 1668 West Juneway Terrace in the early morning hours of August 12, 2018. When Rothstein and her partner arrived, and after speaking with members of the Chicago Fire Department, she spoke to Rosalind, who was near the front courtyard entryway of the building. She and Rosalind then went to the back porch of the apartment. Rothstein noticed some liquid "outside of the window where the damage was." Rothstein then returned to the front courtyard, where she saw a police sergeant and defendant. Rothstein said defendant was speaking loudly, acting irate, and waving his hands around. Rothstein added that defendant said he was going to "set that mother****er on fire," which she believed was defendant's intention to set the apartment building on fire. Rothstein reiterated that defendant was very irate, speaking loudly, and apparently intoxicated.

¶ 13 After speaking with Rosalind again, Rothstein went back to the apartment. There, Rosalind brought her to the rear bedroom, where Rothstein saw damage "[n]ear *** or on the windowsill." Rothstein recovered from Rosalind a red rag that was soaked in gasoline in a plastic bag and a "grapefruit juice glass bottle" and a "soaked" blue flannel shirt. Rothstein placed those items in inventory and then returned to her car, where her partner was in the driver's seat and defendant was in the back, shirtless. The officers took defendant to the police station, where arson detectives took custody of defendant.

¶ 14    On cross-examination, Rothstein agreed that there was no visible damage to the back porch. Rothstein further characterized the damage on the windowsill as "minimal," but she noted that it was bigger than a smudge and was "charred." Rothstein also agreed that the police sergeant did not restrain defendant, despite defendant being irate and waving his hands, and that defendant "just walked up to [the] sergeant." Rothstein said that defendant's speech was slightly slurred, but she could smell alcohol on his breath. Rothstein conceded that, when she had Rosalind "sign the paperwork," the indicated charge was "criminal damage to property" because that is what the sergeant told her to write.

¶ 15    Chicago police detective Fred Schall testified that he had worked in the department's arson unit for 17 years. Schall stated that, on August 12, 2018, he was assigned to investigate a possible arson at 1668 West Juneway Terrace. Schall went to that location and conducted a "fire analysis," after which he concluded that there were two separate fires set: one outside on the back porch and another "inside the boys' bedroom." Schall also conducted a videorecorded interview of Rosalind with assistant State's Attorney Lindsay Ruedig. Schall agreed that Rosalind was asked about "the presence of fire inside the bedroom." Schall stated Rosalind did not tell them that she pulled the rag from outside into the room; rather, Schall stated that Rosalind told them that "there was a rag that was hanging there and it was on fire."

¶ 16    Schall also interviewed defendant twice. At the second interview, an assistant State's Attorney was present. Both interviews were videorecorded and played for the jury. In the first interview, defendant stated that he had been drinking alcohol from around 2 p.m. on August 11, 2018, until 4 a.m. the next morning. Defendant initially admitted that he tried to burn Rosalind's apartment down because he saw another man inside with his children, but he later stated that he thought the children were at an aunt's house. Defendant stated that he had an argument with Dixon

6

on the back porch and wanted to fight with him, but Dixon refused because defendant had some friends with him. Afterwards, defendant bought gasoline, poured some of it onto his red shirt, and then threw the shirt "into" one of the windows of Rosalind's apartment. Defendant saw Rosalind put the fire out, and then he went to purchase more gasoline. Defendant, however, did not remember what he did with that gasoline purchase. Defendant stated that he only lit his red shirt on fire, but he could not remember what happened to the checkered shirt he had been wearing. Defendant said that the police stopped him before he had a chance to light a second fire.

¶ 17 In the second interview, defendant stated that he drank three fifths of vodka before going to Rosalind's apartment. Defendant said that he went to visit his kids and knew Rosalind and the children were at home. When defendant saw another man in the apartment, however, defendant went to a gas station, purchased some gasoline, returned to the apartment, put some gas on a red rag, lit the rag, and then threw it in the window. Defendant saw Rosalind put out the fire and then went to another gas station to purchase more gasoline. Defendant did not recall what happened to the gasoline after that. Defendant stated that, when he returned to the apartment, the police were already there. Defendant denied putting gasoline on the checkered shirt he was wearing and lighting that shirt.

¶ 18 Finally, Kimberlee Gruenstein, a forensic scientist with the Illinois State Police, testified that she analyzed the chemical on the red rag and the blue shirt and found degraded gasoline and gasoline, respectively. The State then rested, and defendant presented his case in chief.

¶ 19 Defendant testified on his own behalf. Defendant stated that, on the morning of August 11, he and his friend Michael Williams went to a Jewel grocery store and purchased some vodka. The two then went to a nearby park and started drinking. After a while, Williams showed defendant some marijuana and asked if defendant wanted to smoke it with him. Defendant said

that he and Williams spent time "hanging" in the park "all day, all night, until morning." Defendant added that, at some point, he remembered "just getting up" and going "somewhere," but he did not remember where. Defendant said, "I came back to finish off my liquor. That was it." The last thing defendant remembered was "waking up in the police station." Defendant did not remember going to a gas station, lighting anything on fire, or arguing with another man.

¶ 20 Defendant said he had never before "blacked out" from drinking alcohol or smoking marijuana. Defendant also stated that he did not remember the questions or his answers during his interviews at the police station. Defendant had never before acted as depicted in the video from the apartment building courtyard. Defendant further confirmed that he had never tried to hurt Rosalind or the children after drinking or using marijuana. Defendant said he did not feel like he was in control that night and was unable to understand what was going on. Defendant suspected that he had ingested "something" that caused his behavior. On cross-examination, defendant conceded that he voluntarily consumed two fifths of vodka and smoked marijuana with Williams.

¶ 21 The defense then rested. Defendant asked that the jury be instructed on the lesser-included offense of criminal damage to property, arguing that there was "slight evidence" that defendant knowingly caused damage to the property of another by fire, recklessly did so, or knowingly started a fire on the land of another. The circuit court, however, denied defendant's request. Following closing arguments, the circuit court instructed the jury. The jury found the defendant guilty of aggravated arson, and the court continued the matter for sentencing.

¶ 22 At defendant's sentencing hearing, the circuit court acknowledged that it had defendant's presentence investigation report (PSI). Defense counsel provided the court with letters in mitigation and pointed out various corrections, which the court noted. The court further stated that it had reviewed the "mitigation packet."

8

¶ 23    In aggravation, the State recounted that defendant had three prior felonies:  a 1989 conviction for unlawful use of a weapon by a felon, for which defendant received a three-year prison sentence; a 1987 conviction for burglary, resulting in another three-year prison sentence; and a 1987 conviction for possession of a stolen motor vehicle, which culminated in an 18-month probation sentence that was later terminated as unsatisfactory.  In addition, the State noted that defendant had six misdemeanor convictions, including two domestic battery convictions in 2001 and 1999.  The State then asked the court to consider the fact that "there were multiple people in the apartment" at the time defendant set the fire, which could have resulted in "dire consequences" for the residents of the apartment and the building.

¶ 24    Defendant called Rosalind to testify in mitigation.  Rosalind testified that she worked full time and defendant stayed at home and took care of the children.  Defendant also volunteered at the children's school, accompanied them on field trips, and ensured they did their homework.  Rosalind also pointed out that defendant also cooked, cleaned, and "fix[ed] stuff around the house."  Rosalind confirmed that defendant was never violent with her or the children.  Rosalind noted, however, that since his arrest, she has had to stop working to take care of the children and has been very "stressed out" because she never had to worry about anything while defendant was taking care of the children and the house.

¶ 25    Defendant's arrest has been "really devastating" for her and more so for her children.  Rosalind stated that her children are distant and do not want to be at home.  One of her sons has started smoking marijuana and no longer has any interest in playing basketball.  Regarding Malachi, Rosalind stated that he used to be on the honor roll but has since been getting into "trouble" at school and was kicked out of summer school for "hanging with the wrong guys."  A letter from Malachi was then read into the record.  Malachi wrote that defendant took care of him

and taught him to be "honest and kind to others." Malachi asked the circuit court, "Please send my dad home."

¶ 26 Defense counsel presented the circuit court with nine additional letters attesting to defendant's good character, as well as two mitigation packets. The mitigation packets discussed defendant's childhood abuse from two alcoholic parents and the involvement of the Department of Children and Family Services (DCFS) but which did not result in defendant's removal from his parents. In addition, the packets noted that defendant ran away from home and was homeless at the age of 14. Defendant's felony convictions between the ages of 17 and 19 resulted in further abuse while he was incarcerated. Defendant was diagnosed with both depression and post-traumatic stress disorder (PTSD). Following defense counsel's argument in mitigation, defendant spoke in allocution, stating that he missed his wife and children, they needed him, and he felt "real bad about what happened."

¶ 27 The circuit court then stated its findings. The court noted that, at the initial pretrial conference, the court believed a "very loud and clear and active response" from the court would be necessary. The court then observed that, "the people that were put in immediate danger, are somewhat ironically the same people now asking that [defendant] come home right away because they love him and they need him and they want him." The court added that, based upon the mitigation evidence, it was viewing defendant "in a light perhaps differently than which *** he was originally cast in." The court reiterated that it was being asked by the "very victims of this offense" to be lenient with defendant. The court said that it would therefore moderate its original viewpoint, and it sentenced defendant to 11 years' imprisonment. This appeal follows.

¶ 28                                    ANALYSIS

¶ 29    Defendant contends that (1) the circuit court erred in denying his request for a jury instruction on criminal damage to property, and (2) his sentence is excessive. Defendant argues that there was some evidence in the record that, if believed by the jury, would have reduced his conviction from aggravated arson to criminal damage to property, which is a lesser-included offense of aggravated arson. Defendant further argues that his 11-year sentence is excessive based upon the "abundance of mitigation evidence."

¶ 30                               Jury Instructions

¶ 31    Defendant first contends that the circuit court erred in refusing to instruct the jury on the lesser-included offense of criminal damage to property. Defendant argues that there was some evidence that, if believed by the jury, would have supported that offense. Specifically, defendant asserts that Rosalind's testimony "could have supported a determination by the jury that Michael acted recklessly in holding a burning rag below the window, rather than acting knowingly or deliberately." Therefore, according to defendant, the court abused its discretion in refusing to provide that instruction. The State responds that the court correctly rejected defendant's request, or in the alternative, that any error was harmless beyond a reasonable doubt.

¶ 32    In general, a defendant may not be convicted of an offense for which he has not been charged, but he may nonetheless in certain cases be entitled to proffer an instruction on an uncharged lesser-included offense to the jury. *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). A lesser-included offense is one that "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2020). To determine whether an offense is a lesser-included offense—and whether a defendant is thus entitled to a lesser-included offense

instruction, we employ a two-step "charging instrument" approach. See *People v. Kolton*, 219 Ill. 2d 353, 360-61 (2006). Under this approach, an offense is a lesser-included offense of a charged offense if the factual description of the charged offense in the indictment contains a "broad foundation" or "main outline" of the lesser offense. (Internal quotation marks removed.) *Id.* at 364. In other words, this approach will not prohibit an offense from being deemed a lesser-included offense merely because every element of the lesser offense is not explicitly included in the indictment, provided that the missing element can be reasonably inferred. *Id.*

¶ 33   Nonetheless, merely identifying a lesser-included offense does not "automatically" create a right to a jury instruction on the lesser-included offense. (Internal quotation marks removed.) See *People v. Baldwin*, 199 Ill. 2d 1, 13 (2002). For that reason, when a lesser-included offense is identified, the court proceeds to the second step to determine whether the defendant has a right to the instruction. This second step requires the court to examine the trial evidence and decide whether that evidence rationally supports a conviction for the lesser-included offense. *People v. Medina*, 221 Ill. 2d 394, 405 (2006) (holding that a defendant has the right to a lesser-included offense instruction "only if the evidence at trial is such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater").

¶ 34   Our standard of review differs depending upon the step in our analysis. The first step (*i.e.*, whether an offense is a lesser-included offense of a charged crime) is an issue of law that we review *de novo*. *People v. Kennebrew*, 2013 IL 113998, ¶ 18 (citing *People v. Kolton*, 219 Ill. 2d 353, 361 (2006)). The second step (*i.e.*, whether there is sufficient evidence justifying a jury instruction on a lesser-included offense), however, is a decision that we review for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "An abuse of discretion exists only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person

12

would take the view adopted by the trial court." *People v. Ramsey*, 239 Ill. 2d 342, 429 (2010) (citing *People v. Donoho*, 204 Ill. 2d 159, 182 (2003)).

¶ 35    Section 20-1.1 of the Criminal Code of 2012 (Code) provides in part that a person commits aggravated arson when "in the course of committing arson he *** knowingly damages, partially or totally, any building or structure, *** and (1) he knows or reasonably should know that one or more persons are present therein ***." 720 ILCS 5/20-1.1 (West 2020). Section 21-1(a) of the Code states that a person commits criminal damage to property when he "(2) recklessly by means of fire *** damages property of another; [or] (3) knowingly starts a fire on the land of another; ***."[1] 720 ILCS 5/21-1(a)(2), (3) (West 2020).

¶ 36    In this case, the State alleged that defendant, while "in the course of committing arson, *** knowingly damaged the building, damaged the window and wall of the apartment *** and knew or reasonably should have known that one or more persons were present therein." Defendant and the State agree that, based upon the charging instrument approach, criminal damage to property is a lesser-included offense of aggravated arson.

¶ 37    We agree with the parties. Defendant's indictment charged him with knowingly damaging another's property (*i.e.*, Rosalind's) by starting a fire. This supports a charge of criminal damage to property under section 21-1(a)(2) of the Code because "the higher mental state of knowledge [under the aggravated arson statute] can be viewed to provide an outline for the mental state of recklessness." *People v. Parsons*, 284 Ill. App. 3d 1049, 1059 (1996); see also *People v. Kyles*, 303 Ill. App. 3d 338, 350 (1998) (holding that, although the criminal damage to property statute

---

[1]    On appeal, defendant no longer argues that the evidence supports a lesser-included offense instruction based upon section 21-1(a)(1) ("knowingly damages any property of another"). We further note that defendant erroneously refers to section 21-1(a)(3) in his brief as "subsection 1(c)," which refers to an older version of the statute.

involves a different mental state of recklessness than the aggravated arson statute, that distinction is nonetheless "not fatal since by definition an included offense may be an offense which requires proof of a less culpable mental state"). Therefore, based upon the indictment in this case, criminal damage to property is a lesser-included offense of aggravated arson. Accord *People v. Phillips*, 383 Ill. App. 3d 521, 541-42 (2008); *Parsons*, 284 Ill. App. 3d at 1058-59; *People v. Bradley*, 256 Ill. App. 3d 514, 516-17 (1993); see also *Kyles*, 303 Ill. App. 3d at 349-50 (finding that criminal damage to property was a lesser-included offense of *attempted* aggravated arson).

¶ 38    We now consider the second step of our analysis, which requires an examination of the trial evidence to determine whether the jury could have rationally found defendant guilty of the lesser offense. See *Medina*, 221 Ill. 2d at 405. As noted above, defendant observes that Rosalind testified at trial that *she* reached through the torn bedroom window screen, took the burning rag from defendant's hand, and then dropped it onto the bedroom windowsill before extinguishing it. According to defendant, this evidence supported an instruction on the lesser-included offense of criminal damage to property, and if the jury believed this evidence, it could have rationally found defendant guilty of this lesser offense. We disagree.

¶ 39    Here, the evidence at trial revealed that defendant admitted to police—twice—that he intentionally set fire to the building. Specifically, defendant consistently stated that he threw a burning red rag into or in the bedroom window of Rosalind's apartment. In addition, his angry outburst at the scene that he wanted to "burn that mother****er down" (obviously referring to the apartment where his wife and children lived) further supported an intentional, not reckless, act. One of his children also testified that the "window was on fire" *before* Rosalind entered the room and extinguished the burning rag. Detective Schall further testified that Rosalind told him that, when she entered the bedroom, there was already a burning rag "hanging there." On these facts,

14

we cannot hold that the jury rationally could have convicted defendant of a merely reckless act or merely starting a fire on the land of another. Consequently, the circuit court's denial was not arbitrary, fanciful, or unreasonable, such that no reasonable person would take that view. *Ramsey*, 239 Ill. 2d at 429. Since the court did not abuse its discretion in refusing the instruction on the lesser-included offense of criminal damage to property, we must reject defendant's claim of error.

¶ 40    In reaching this conclusion, we find that defendant's reliance upon *Bradley* is misplaced. There, the defendant was convicted of two counts of aggravated arson for having started a fire on a mattress at her boyfriend's apartment. *Bradley*, 256 Ill. App. 3d at 514-15. On appeal, the defendant argued that the circuit court erred in refusing to instruct the jury on criminal damage to property. *Id.* at 514. The defendant had initially told police investigators that she "may have dropped a cigarette and that might have started the fire." *Id.* at 515. Upon further questioning, however, the defendant admitted to starting the fire with a lighter. *Id.* We agreed with the defendant's claim of error because, although she recanted her initial statement that she accidentally dropped a lit cigarette onto the mattress and ignited the fire, the initial statement could have supported the jury's finding that the defendant acted recklessly rather than knowingly or deliberately. *Id.* at 516. We thus reversed her conviction and remanded the cause for a new trial. *Id.* at 517. Here, by contrast, defendant unequivocally—and repeatedly—stated that he intended to set fire to the apartment. The evidence here, unlike in *Bradley*, overwhelmingly established that defendant's acts were not reckless, and therefore no jury could rationally have found defendant guilty of criminal damage to property. Defendant's reliance upon *Bradley* is therefore unavailing.

¶ 41                                      Defendant's Sentence

¶ 42    Defendant also contends that his 11-year sentence is excessive. Specifically, defendant argues that the circuit court "gave inadequate weight to" the substantial mitigating evidence at his

15

sentencing hearing. Specifically, defendant notes that the defense presented mitigation evidence of (1) the neglect and abuse he suffered as a child; (2) minimal criminal history; (3) his mental health issues (including depression, post-traumatic stress disorder, and alcoholism); (4) his attempts to achieve sobriety; (5) his extensive support from and involvement in the community, including his volunteer work at the children's school; as well as (6) family support, including from Rosalind, his wife and the victim in this case, who testified that defendant's absence from the family is seriously harming their children's well-being. Defendant asks that we either reduce his sentence or remand this matter for resentencing.

¶ 43    The circuit court has broad discretionary powers in imposing a sentence, and its sentencing decision is entitled to "great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This deference is based upon the fact that the circuit court is in a better position to consider the relevant sentencing factors in both aggravation and mitigation. *Id.* As a result, it is a long-held rule that we may not substitute our judgment for that of the circuit court merely because we would have weighed these factors differently. *Id.*; see also *People v. Perruquet*, 68 Ill. 2d 149, 156 (1977). To do otherwise would be an "improper exercise of the powers of a reviewing court." *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010) (citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991)). Finally, it is well settled that a sentence within statutory guidelines is presumed to be proper unless it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999) (citing *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987)).

¶ 44    With respect to factors in mitigation, we presume the circuit court properly considered all relevant mitigating factors presented, absent some indication to the contrary other than the sentence itself. See *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 21; *People v. Madura*,

257 Ill. App. 3d 735, 740 (1994). In addition, the court need not recite and assign a value to every mitigating factor upon which it relies. *Id.* at 740-41. "The fact that a court expressly mentions a factor in mitigation does not mean the court ignored other factors." *People v. Burton*, 184 Ill. 2d 1, 34 (1998) (citing *People v. Burrows*, 148 Ill. 2d 196, 254-56 (1992)). We review whether the court failed to consider evidence in mitigation for an abuse of discretion. See *People v. Burnette*, 325 Ill. App. 3d 792, 807-09 (2001); *People v. Spencer*, 229 Ill. App. 3d 1098, 1102 (1992). As discussed earlier, we will only hold that the court has abused its discretion if its decision is "arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by [it]." *Ramsey*, 239 Ill. 2d at 429 (citing *Donoho*, 204 Ill. 2d at 182).

¶ 45    In this case, defendant was convicted of aggravated arson, which has a sentencing range of 6 to 30 years' imprisonment. See 720 ILCS 5/20-1.1(b) (West 2020) (aggravated arson is a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2020) (6- to 30-year sentencing range for class X felonies). Defendant's 11-year sentence is within this range, so we must presume that this sentence is proper. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 12. Defendant, however, argues that the sentence is nonetheless improper because the circuit court purportedly gave inadequate weight to the substantial mitigating evidence presented at defendant's sentencing hearing.

¶ 46    The transcript of the State's entire argument in aggravation at defendant's sentencing hearing comprises less than one page. By contrast, defendant's evidence and argument in mitigation spans approximately 28 pages, including favorable testimony from Rosalind (the victim), a letter by Malachi (another victim) read into the record, multiple letters in support from various members of the community, and two "packets" of mitigation reports. This substantial mitigation evidence was presented to the circuit court. The court stated that it had reviewed the mitigation "packets," the numerous letters of support, and heard Rosalind's testimony and

Malachi's letter to the court. The court noted the irony of the victims of defendant's act being the ones asking the court for defendant's immediate release "because they love him and they need him and they want him." The court was clearly moved by this evidence because it stated that it now viewed defendant in a different "light" than at the start of the case. The effect on the court was equally clear: it decided to "moderate its original viewpoint" and impose an 11-year sentence, which was well below the mid-point of the sentencing range and only five years above the statutory minimum, and which necessarily took into account defendant's considerable criminal background, which included three prior felony convictions. Defendant's argument that the court "gave inadequate weight to the mitigation evidence" seems to be an invitation for this court to reweigh the mitigation evidence. It is, however, an invitation we must decline. See, *e.g.*, *Alexander*, 239 Ill. 2d at 214-15; *Streit*, 142 Ill. 2d 19; *Stacey*, 193 Ill. 2d at 209; *Perruquet*, 68 Ill. 2d at 156. After a careful review of the evidence at defendant's sentencing hearing, we cannot hold that the court's consideration of the mitigating evidence was arbitrary, fanciful, or unreasonable, such that no reasonable person would take its view. See *Ramsey*, 239 Ill. 2d at 429. As such, it did not abuse its discretion. See *Burnette*, 325 Ill. App. 3d at 807-09; *Spencer*, 229 Ill. App. 3d at 1102. We must therefore conclude defendant's sentence was proper because it was neither greatly at variance with the spirit and purpose of the law nor manifestly disproportionate to the nature of the offense. *Fern*, 189 Ill. 2d at 54. Defendant's claim of error on this point is thus unavailing.

¶ 47                                    CONCLUSION

¶ 48     The circuit court correctly denied defendant's request for a lesser-included offense jury instruction. Defendant's sentence is not excessive. Accordingly, we affirm the judgment of the circuit court.

¶ 49     Affirmed.